(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLOWERS *v.* MISSISSIPPI

### CERTIORARI TO THE SUPREME COURT OF MISSISSIPPI

No. 17–9572.   Argued March 20, 2019—Decided June 21, 2019

Petitioner Curtis Flowers has been tried six separate times for the murder of four employees of a Mississippi furniture store.  Flowers is black; three of the four victims were white.  At the first two trials, the State used its peremptory strikes on all of the qualified black prospective jurors.  In each case, the jury convicted Flowers and sentenced him to death, but the convictions were later reversed by the Mississippi Supreme Court based on prosecutorial misconduct.  At the third trial, the State used all of its 15 peremptory strikes against black prospective jurors, and the jury convicted Flowers and sentenced him to death.  The Mississippi Supreme Court reversed again, this time concluding that the State exercised its peremptory strikes on the basis of race in violation of *Batson* v. *Kentucky*, 476 U. S. 79.  Flowers' fourth and fifth trials ended in mistrials.  At the fourth, the State exercised 11 peremptory strikes—all against black prospective jurors.  No available racial information exists about the prospective jurors in the fifth trial.  At the sixth trial, the State exercised six peremptory strikes—five against black prospective jurors, allowing one black juror to be seated.  Flowers again raised a *Batson* claim, but the trial court concluded that the State had offered race-neutral reasons for each of the five peremptory strikes.  The jury convicted Flowers and sentenced him to death.  The Mississippi Supreme Court affirmed.  After this Court vacated that judgment and remanded in light of *Foster* v. *Chatman*, 578 U. S. ___, the Mississippi Supreme Court again upheld Flowers' conviction in a divided 5-to-4 decision.  Justice King dissented on the *Batson* issue and was joined by two other Justices.

*Held*: All of the relevant facts and circumstances taken together establish that the trial court at Flowers' sixth trial committed clear error in concluding that the State's peremptory strike of black prospective

juror Carolyn Wright was not motivated in substantial part by dis-
criminatory intent. Pp. 7–31.

(a) Under *Batson*, once a prima facie case of discrimination has
been shown by a defendant, the State must provide race-neutral rea-
sons for its peremptory strikes. The trial judge then must determine
whether the prosecutor's stated reasons were the actual reasons or
instead were a pretext for discrimination. The *Batson* Court rejected
four arguments. First, the *Batson* Court rejected the idea that a de-
fendant must demonstrate a history of racially discriminatory strikes
in order to make out a claim of race discrimination. Second, the *Bat-
son* Court rejected the argument that a prosecutor could strike a
black juror based on an assumption or belief that the black juror
would favor a black defendant. Third, the *Batson* Court rejected the
argument that race-based peremptories should be permissible be-
cause black, white, Asian, and Hispanic defendants and jurors were
all "equally" subject to race-based discrimination. Fourth, the *Batson*
Court rejected the argument that race-based peremptories are per-
missible because both the prosecution and defense could employ them
in any individual case and in essence balance things out. Pp. 7–15.

(b) Four categories of evidence loom large in assessing the *Batson*
issue here, where the State had a persistent pattern of striking black
prospective jurors from Flowers' first through his sixth trial. Pp. 15–
30.

(1) A review of the history of the State's peremptory strikes in
Flowers' first four trials strongly supports the conclusion that the
State's use of peremptory strikes in Flowers' sixth trial was motivat-
ed in substantial part by discriminatory intent. The State tried to
strike all 36 black prospective jurors over the course of the first four
trials. And the state courts themselves concluded that the State had
violated *Batson* on two separate occasions. The State's relentless, de-
termined effort to rid the jury of black individuals strongly suggests
that the State wanted to try Flowers before a jury with as few black
jurors as possible, and ideally before an all-white jury. Pp. 19–22.

(2) The State's use of peremptory strikes in Flowers' sixth trial
followed the same pattern as the first four trials. Pp. 22–23.

(3) Disparate questioning can be probative of discriminatory in-
tent. *Miller-El* v. *Cockrell*, 537 U. S. 322, 331–332, 344–345. Here,
the State spent far more time questioning the black prospective ju-
rors than the accepted white jurors—145 questions asked of 5 black
prospective jurors and 12 questions asked of 11 white seated jurors.
The record refutes the State's explanation that it questioned black
and white prospective jurors differently only because of differences in
the jurors' characteristics. Along with the historical evidence from
the earlier trials, as well as the State's striking of five of six black

prospective jurors at the sixth trial, the dramatically disparate questioning and investigation of black prospective jurors and white prospective jurors at the sixth trial strongly suggest that the State was motivated in substantial part by a discriminatory intent. Pp. 23–26.

(4) Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred. See *Snyder* v. *Louisiana*, 552 U. S. 472, 483–484. Here, Carolyn Wright, a black prospective juror, was struck, the State says, in part because she knew several defense witnesses and had worked at Wal-Mart where Flowers' father also worked. But three white prospective jurors also knew many individuals involved in the case, and the State asked them no individual questions about their connections to witnesses. White prospective jurors also had relationships with members of Flowers' family, but the State did not ask them follow-up questions in order to explore the depth of those relationships. The State also incorrectly explained that it exercised a peremptory strike against Wright because she had worked with one of Flowers' sisters and made apparently incorrect statements to justify the strikes of other black prospective jurors. When considered with other evidence, a series of factually inaccurate explanations for striking black prospective jurors can be another clue showing discriminatory intent. The overall context here requires skepticism of the State's strike of Carolyn Wright. The trial court at Flowers' sixth trial committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not motivated in substantial part by discriminatory intent. Pp. 26–30.

240 So. 3d 1082, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a concurring opinion. THOMAS, J., filed a dissenting opinion, in which GORSUCH, J., joined as to Parts I, II, and III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–9572

## CURTIS GIOVANNI FLOWERS, PETITIONER *v.* MISSISSIPPI

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MISSISSIPPI

[June 21, 2019]

JUSTICE KAVANAUGH delivered the opinion of the Court.

In *Batson* v. *Kentucky*, 476 U. S. 79 (1986), this Court ruled that a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial.

In 1996, Curtis Flowers allegedly murdered four people in Winona, Mississippi. Flowers is black. He has been tried six separate times before a jury for murder. The same lead prosecutor represented the State in all six trials.

In the initial three trials, Flowers was convicted, but the Mississippi Supreme Court reversed each conviction. In the first trial, Flowers was convicted, but the Mississippi Supreme Court reversed the conviction due to "numerous instances of prosecutorial misconduct." *Flowers* v. *State*, 773 So. 2d 309, 327 (2000). In the second trial, the trial court found that the prosecutor discriminated on the basis of race in the peremptory challenge of a black juror. The trial court seated the black juror. Flowers was then convicted, but the Mississippi Supreme Court again reversed the conviction because of prosecutorial misconduct at trial.

In the third trial, Flowers was convicted, but the Mississippi Supreme Court yet again reversed the conviction, this time because the court concluded that the prosecutor had again discriminated against black prospective jurors in the jury selection process. The court's lead opinion stated: "The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge." *Flowers* v. *State*, 947 So. 2d 910, 935 (2007). The opinion further stated that the "State engaged in racially discriminatory practices during the jury selection process" and that the "case evinces an effort by the State to exclude African-Americans from jury service." *Id.,* at 937, 939.

The fourth and fifth trials of Flowers ended in mistrials due to hung juries.

In his sixth trial, which is the one at issue here, Flowers was convicted. The State struck five of the six black prospective jurors. On appeal, Flowers argued that the State again violated *Batson* in exercising peremptory strikes against black prospective jurors. In a divided 5-to-4 decision, the Mississippi Supreme Court affirmed the conviction. We granted certiorari on the *Batson* question and now reverse. See 586 U. S. ___ (2018).

Four critical facts, taken together, require reversal. *First*, in the six trials combined, the State employed its peremptory challenges to strike 41 of the 42 black prospective jurors that it could have struck—a statistic that the State acknowledged at oral argument in this Court. Tr. of Oral Arg. 32. *Second*, in the most recent trial, the sixth trial, the State exercised peremptory strikes against five of the six black prospective jurors. *Third*, at the sixth trial, in an apparent effort to find pretextual reasons to strike black prospective jurors, the State engaged in dramatically disparate questioning of black and white prospective jurors. *Fourth*, the State then struck at least one black prospective juror, Carolyn Wright, who was similarly

situated to white prospective jurors who were not struck by the State.

We need not and do not decide that any one of those four facts alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not "motivated in substantial part by discriminatory intent." *Foster* v. *Chatman*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 23) (internal quotation marks omitted). In reaching that conclusion, we break no new legal ground. We simply enforce and reinforce *Batson* by applying it to the extraordinary facts of this case.

We reverse the judgment of the Supreme Court of Mississippi, and we remand the case for further proceedings not inconsistent with this opinion.

I

The underlying events that gave rise to this case took place in Winona, Mississippi. Winona is a small town in northern Mississippi, just off I–55 almost halfway between Jackson and Memphis. The total population of Winona is about 5,000. The town is about 53 percent black and about 46 percent white.

In 1996, Bertha Tardy, Robert Golden, Derrick Stewart, and Carmen Rigby were murdered at the Tardy Furniture store in Winona. All four victims worked at the Tardy Furniture store. Three of the four victims were white; one was black. In 1997, the State charged Curtis Flowers with murder. Flowers is black. Since then, Flowers has been tried six separate times for the murders. In each of the first two trials, Flowers was tried for one individual murder. In each subsequent trial, Flowers was tried for all four of the murders together. The same state prosecutor tried Flowers each time. The prosecutor is white.

At Flowers' first trial, 36 prospective jurors—5 black and 31 white—were presented to potentially serve on the jury. The State exercised a total of 12 peremptory strikes, and it used 5 of them to strike the five qualified black prospective jurors. Flowers objected, arguing under *Batson* that the State had exercised its peremptory strikes in a racially discriminatory manner. The trial court rejected the *Batson* challenge. Because the trial court allowed the State's peremptory strikes, Flowers was tried in front of an all-white jury. The jury convicted Flowers and sentenced him to death.

On appeal, the Mississippi Supreme Court reversed the conviction, concluding that the State had committed prosecutorial misconduct in front of the jury by, among other things, expressing baseless grounds for doubting the credibility of witnesses and mentioning facts that had not been allowed into evidence by the trial judge. *Flowers*, 773 So. 2d, at 317, 334. In its opinion, the Mississippi Supreme Court described "numerous instances of prosecutorial misconduct" at the trial. *Id.,* at 327. Because the Mississippi Supreme Court reversed based on prosecutorial misconduct at trial, the court did not reach Flowers' *Batson* argument. See *Flowers*, 773 So. 2d, at 327.

At the second trial, 30 prospective jurors—5 black and 25 white—were presented to potentially serve on the jury. As in Flowers' first trial, the State again used its strikes against all five black prospective jurors. But this time, the trial court determined that the State's asserted reason for one of the strikes was a pretext for discrimination. Specifically, the trial court determined that one of the State's proffered reasons—that the juror had been inattentive and was nodding off during jury selection—for striking that juror was false, and the trial court therefore sustained Flowers' *Batson* challenge. The trial court disallowed the strike and sat that black juror on the jury. The jury at Flowers' second trial consisted of 11 white jurors and 1

black juror. The jury convicted Flowers and sentenced him to death.

On appeal, the Mississippi Supreme Court again reversed. The court ruled that the prosecutor had again engaged in prosecutorial misconduct in front of the jury by, among other things, impermissibly referencing evidence and attempting to undermine witness credibility without a factual basis. See *Flowers* v. *State*, 842 So. 2d 531, 538, 553 (2003).

At Flowers' third trial, 45 prospective jurors—17 black and 28 white—were presented to potentially serve on the jury. One of the black prospective jurors was struck for cause, leaving 16. The State exercised a total of 15 peremptory strikes, and it used all 15 against black prospective jurors. Flowers again argued that the State had used its peremptory strikes in a racially discriminatory manner. The trial court found that the State had not discriminated on the basis of race. See *Flowers*, 947 So. 2d, at 916. The jury in Flowers' third trial consisted of 11 white jurors and 1 black juror. The lone black juror who served on the jury was seated after the State ran out of peremptory strikes. The jury convicted Flowers and sentenced him to death.

On appeal, the Mississippi Supreme Court yet again reversed, concluding that the State had again violated *Batson* by discriminating on the basis of race in exercising all 15 of its peremptory strikes against 15 black prospective jurors. See *Flowers*, 947 So. 2d, at 939. The court's lead opinion stated: "The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge." *Id.,* at 935. The opinion explained that although "each individual strike may have justifiably appeared to the trial court to be sufficiently race neutral, the trial court also has a duty to look at the State's use of peremptory challenges *in toto.*" *Id.,* at 937. The opinion emphasized that

"trial judges should not blindly accept any and every reason put forth by the State, especially" when "the State continues to exercise challenge after challenge only upon members of a particular race." *Ibid*. The opinion added that the "State engaged in racially discriminatory practices" and that the "case evinces an effort by the State to exclude African-Americans from jury service." *Id.,* at 937, 939.

At Flowers' fourth trial, 36 prospective jurors—16 black and 20 white—were presented to potentially serve on the jury. The State exercised a total of 11 peremptory strikes, and it used all 11 against black prospective jurors. But because of the relatively large number of prospective jurors who were black, the State did not have enough peremptory challenges to eliminate all of the black prospective jurors. The seated jury consisted of seven white jurors and five black jurors. That jury could not reach a verdict, and the proceeding ended in a mistrial.

As to the fifth trial, there is no available racial information about the prospective jurors, as distinct from the jurors who ultimately sat on the jury. The jury was composed of nine white jurors and three black jurors. The jury could not reach a verdict, and the trial again ended in a mistrial.

At the sixth trial, which we consider here, 26 prospective jurors—6 black and 20 white—were presented to potentially serve on the jury. The State exercised a total of six peremptory strikes, and it used five of the six against black prospective jurors, leaving one black juror to sit on the jury. Flowers again argued that the State had exercised its peremptory strikes in a racially discriminatory manner. The trial court concluded that the State had offered race-neutral reasons for each of the five peremptory strikes against the five black prospective jurors. The jury at Flowers' sixth trial consisted of 11 white jurors and 1 black juror. That jury convicted Flowers of murder and

sentenced him to death.

In a divided decision, the Mississippi Supreme Court agreed with the trial court on the *Batson* issue and stated that the State's "race-neutral reasons were valid and not merely pretextual." *Flowers* v. *State*, 158 So. 3d 1009, 1058 (2014). Flowers then sought review in this Court. This Court granted Flowers' petition for a writ of certiorari, vacated the judgment of the Mississippi Supreme Court, and remanded for further consideration in light of the decision in *Foster*, 578 U. S. \_\_\_. *Flowers* v. *Mississippi*, 579 U. S. \_\_\_ (2016). In *Foster*, this Court held that the defendant Foster had established a *Batson* violation. 578 U. S., at \_\_\_ (slip op., at 25).

On remand, the Mississippi Supreme Court by a 5-to-4 vote again upheld Flowers' conviction. See 240 So. 3d 1082 (2017). Justice King wrote a dissent for three justices. He stated: "I cannot conclude that Flowers received a fair trial, nor can I conclude that prospective jurors were not subjected to impermissible discrimination." *Id.*, at 1172. According to Justice King, both the trial court and the Mississippi Supreme Court "completely disregard[ed] the constitutional right of prospective jurors to be free from a racially discriminatory selection process." *Id.,* at 1171. We granted certiorari. See 586 U. S. \_\_\_.

## II

### A

Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process. See *Powers* v. *Ohio*, 499 U. S. 400, 407 (1991).

Jury selection in criminal cases varies significantly based on state and local rules and practices, but ordinarily consists of three phases, which we describe here in general terms. *First*, a group of citizens in the community is randomly summoned to the courthouse on a particular day for

potential jury service. *Second*, a subgroup of those prospective jurors is called into a particular courtroom for a specific case. The prospective jurors are often questioned by the judge, as well as by the prosecutor and defense attorney. During that second phase, the judge may excuse certain prospective jurors based on their answers. *Third*, the prosecutor and defense attorney may challenge certain prospective jurors. The attorneys may challenge prospective jurors for cause, which usually stems from a potential juror's conflicts of interest or inability to be impartial. In addition to challenges for cause, each side is typically afforded a set number of peremptory challenges or strikes. Peremptory strikes have very old credentials and can be traced back to the common law. Those peremptory strikes traditionally may be used to remove any potential juror for any reason—no questions asked.

That blanket discretion to peremptorily strike prospective jurors for any reason can clash with the dictates of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This case arises at the intersection of the peremptory challenge and the Equal Protection Clause. And to understand how equal protection law applies to peremptory challenges, it helps to begin at the beginning.

Ratified in 1868 in the wake of the Civil War, the Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." A primary objective of the Equal Protection Clause, this Court stated just five years after ratification, was "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." *Slaughter-House Cases*, 16 Wall. 36, 71 (1873).

In 1875, to help enforce the Fourteenth Amendment,

Congress passed and President Ulysses S. Grant signed the Civil Rights Act of 1875. Ch. 114, 18 Stat. 335. Among other things, that law made it a criminal offense for state officials to exclude individuals from jury service on account of their race. 18 U. S. C. §243. The Act provides: "No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude."

In 1880, just 12 years after ratification of the Fourteenth Amendment, the Court decided *Strauder* v. *West Virginia*, 100 U. S. 303. That case concerned a West Virginia statute that allowed whites only to serve as jurors. The Court held the law unconstitutional.

In reaching its conclusion, the Court explained that the Fourteenth Amendment required "that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color." *Id.,* at 307. In the words of the *Strauder* Court: "The very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." *Id.*, at 308. For those reasons, the Court ruled that the West Virginia statute excluding blacks from jury service violated the Fourteenth Amendment.

As the Court later explained in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the Court's decisions in the *Slaughter-House Cases* and *Strauder* interpreted the Fourteenth Amendment "as proscribing all state-imposed discriminations against the Negro race," including in jury service. *Brown*, 347 U. S., at 490.

In the decades after *Strauder*, the Court reiterated that States may not discriminate on the basis of race in jury selection. See, *e.g., Neal* v. *Delaware*, 103 U. S. 370, 397 (1881); *Carter* v. *Texas*, 177 U. S. 442, 447 (1900); *Norris* v. *Alabama*, 294 U. S. 587, 597–599 (1935); *Hale* v. *Kentucky*, 303 U. S. 613, 616 (1938) (*per curiam*); *Pierre* v. *Louisiana*, 306 U. S. 354, 362 (1939); *Smith* v. *Texas*, 311 U. S. 128, 130–131 (1940); *Avery* v. *Georgia*, 345 U. S. 559, 562 (1953); *Hernandez* v. *Texas*, 347 U. S. 475, 477–478, 482 (1954); *Coleman* v. *Alabama*, 377 U. S. 129, 133 (1964).

But critical problems persisted. Even though laws barring blacks from serving on juries were unconstitutional after *Strauder*, many jurisdictions employed various discriminatory tools to prevent black persons from being called for jury service. And when those tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes in individual cases to remove most or all black prospective jurors.

In the century after *Strauder*, the freedom to exercise peremptory strikes for any reason meant that "the problem of racial exclusion from jury service" remained "widespread" and "deeply entrenched." 5 U. S. Commission on Civil Rights Report 90 (1961). Simple math shows how that happened. Given that blacks were a minority of the population, in many jurisdictions the number of peremptory strikes available to the prosecutor exceeded the number of black prospective jurors. So prosecutors could routinely exercise peremptories to strike all the black prospective jurors and thereby ensure all-white juries. The exclusion of black prospective jurors was almost total in certain

jurisdictions, especially in cases involving black defend-
ants. Similarly, defense counsel could use—and routinely
did use—peremptory challenges to strike all the black
prospective jurors in cases involving white defendants and
black victims.

In the aftermath of *Strauder*, the exclusion of black
jurors became more covert and less overt—often accom-
plished through peremptory challenges in individual
courtrooms rather than by blanket operation of law. But
as this Court later noted, the results were the same for
black jurors and black defendants, as well as for the black
community's confidence in the fairness of the American
criminal justice system. See *Batson*, 476 U. S., at 98–99.

Eighty-five years after *Strauder*, the Court decided
*Swain* v. *Alabama*, 380 U. S. 202 (1965). The defendant
Swain was black. Swain was convicted of a capital offense
in Talladega County, Alabama, and sentenced to death.
Swain presented evidence that no black juror had served
on a jury in Talladega County in more than a decade. See
*id.,* at 226. And in Swain's case, the prosecutor struck all
six qualified black prospective jurors, ensuring that Swain
was tried before an all-white jury. Swain invoked *Strauder*
to argue that the prosecutor in his case had impermis-
sibly discriminated on the basis of race by using peremp-
tory challenges to strike the six black prospective jurors.
See 380 U. S., at 203, 210.

This Court ruled that Swain had not established uncon-
stitutional discrimination. Most importantly, the Court
held that a defendant could not object to the State's use of
peremptory strikes in an individual case. In the Court's
words: "[W]e cannot hold that the striking of Negroes in a
particular case is a denial of equal protection of the laws."
*Id.,* at 221. The *Swain* Court reasoned that prosecutors do
not always judge prospective jurors individually when
exercising peremptory strikes. Instead, prosecutors
choose which prospective jurors to strike "in light of the

limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried." *Ibid.* In the Court's view, the prosecutor could strike prospective jurors on the basis of their group affiliations, including race. In other words, a prosecutor could permissibly strike a prospective juror for any reason, including the assumption or belief that a black prospective juror, because of race, would be favorable to a black defendant or unfavorable to the State. See *id.,* at 220–221.

To be sure, the *Swain* Court held that a defendant could make out a case of racial discrimination by showing that the State "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be," had been responsible for the removal of qualified black prospective jurors so that no black jurors "ever serve on petit juries." *Id.,* at 223. But *Swain*'s high bar for establishing a constitutional violation was almost impossible for any defendant to surmount, as the aftermath of *Swain* amply demonstrated.

Twenty-one years later, in its 1986 decision in *Batson*, the Court revisited several critical aspects of *Swain* and in essence overruled them. In so doing, the *Batson* Court emphasized that "the central concern" of the Fourteenth Amendment "was to put an end to governmental discrimination on account of race." 476 U. S., at 85. The *Batson* Court noted that *Swain* had left prosecutors' peremptory challenges "largely immune from constitutional scrutiny." 476 U. S., at 92–93. In his concurrence in *Batson*, Justice Byron White (the author of *Swain*) agreed that *Swain* should be overruled. He stated: "[T]he practice of peremptorily eliminating blacks from petit juries in cases with black defendants remains widespread, so much so" that "I agree with the Court that the time has come to rule as it has." 476 U. S., at 101–102.

Under *Batson*, once a prima facie case of discrimination has been shown by a defendant, the State must provide

race-neutral reasons for its peremptory strikes. The trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination. *Id.,* at 97–98.

Four parts of *Batson* warrant particular emphasis here.

*First*, the *Batson* Court rejected *Swain*'s insistence that a defendant demonstrate a history of racially discriminatory strikes in order to make out a claim of race discrimination. See 476 U. S., at 95. According to the *Batson* Court, defendants had run into "practical difficulties" in trying to prove that a State had systematically "exercised peremptory challenges to exclude blacks from the jury on account of race." *Id.*, at 92, n. 17. The *Batson* Court explained that, in some jurisdictions, requiring a defendant to "investigate, over a number of cases, the race of persons tried in the particular jurisdiction, the racial composition of the venire and petit jury, and the manner in which both parties exercised their peremptory challenges" posed an "insurmountable" burden. *Ibid.*

In addition to that practical point, the Court stressed a basic equal protection point: In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many.

For those reasons, the *Batson* Court held that a criminal defendant could show "purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges *at the defendant's trial*." *Id.*, at 96 (emphasis added).

*Second*, the *Batson* Court rejected *Swain*'s statement that a prosecutor could strike a black juror based on an assumption or belief that the black juror would favor a black defendant. In some of the most critical sentences in the *Batson* opinion, the Court emphasized that a prosecutor may not rebut a claim of discrimination "by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they

would be partial to the defendant because of their shared race." 476 U. S., at 97. The Court elaborated: The Equal Protection Clause "forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." *Id.,* at 97–98. In his concurrence, Justice Thurgood Marshall drove the point home: "Exclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than whites to consider fairly or sympathetically the State's case against a black defendant than it can be justified by the notion that blacks lack the intelligence, experience, or moral integrity to be entrusted with that role." *Id.,* at 104–105 (internal quotation marks and citations omitted).

*Third*, the *Batson* Court did not accept the argument that race-based peremptories should be permissible because black, white, Asian, and Hispanic defendants and jurors were all "equally" subject to race-based discrimination. The Court stated that each removal of an individual juror because of his or her race is a constitutional violation. Discrimination against one defendant or juror on account of race is not remedied or cured by discrimination against other defendants or jurors on account of race. As the Court later explained: Some say that there is no equal protection violation if individuals "of all races are subject to like treatment, which is to say that white jurors are subject to the same risk of peremptory challenges based on race as are all other jurors. The suggestion that racial classifications may survive when visited upon all persons is no more authoritative today than the case which advanced the theorem, *Plessy* v. *Ferguson*, 163 U. S. 537

(1896). This idea has no place in our modern equal protection jurisprudence. It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree." *Powers*, 499 U. S., at 410 (citing *Loving* v. *Virginia*, 388 U. S. 1 (1967)).

*Fourth*, the *Batson* Court did not accept the argument that race-based peremptories are permissible because both the prosecution and defense could employ them in any individual case and in essence balance things out. Under the Equal Protection Clause, the Court stressed, even a single instance of race discrimination against a prospective juror is impermissible. Moreover, in criminal cases involving black defendants, the both-sides-can-do-it argument overlooks the percentage of the United States population that is black (about 12 percent) and the cold reality of jury selection in most jurisdictions. Because blacks are a minority in most jurisdictions, prosecutors often have more peremptory strikes than there are black prospective jurors on a particular panel. In the pre-*Batson* era, therefore, allowing each side in a case involving a black defendant to strike prospective jurors on the basis of race meant that a prosecutor could eliminate all of the black jurors, but a black defendant could not eliminate all of the white jurors. So in the real world of criminal trials against black defendants, both history and math tell us that a system of race-based peremptories does not treat black defendants and black prospective jurors equally with prosecutors and white prospective jurors. Cf. *Batson*, 476 U. S., at 99.

## B

Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process. Enforcing that constitutional principle, *Batson* ended the widespread practice in which prosecutors could (and often would) routinely strike all black prospective jurors in cases involving black defendants. By taking steps to

eradicate racial discrimination from the jury selection process, *Batson* sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system. *Batson* immediately revolutionized the jury selection process that takes place every day in federal and state criminal courtrooms throughout the United States.

In the decades since *Batson*, this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding. See *Foster*, 578 U. S. ___; *Snyder* v. *Louisiana*, 552 U. S. 472 (2008); *Miller-El* v. *Dretke*, 545 U. S. 231 (2005) (*Miller-El II*). Moreover, the Court has extended *Batson* in certain ways. A defendant of any race may raise a *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races. See *Hernandez*, 347 U. S., at 477–478; *Powers*, 499 U. S., at 406. Moreover, *Batson* now applies to gender discrimination, to a criminal defendant's peremptory strikes, and to civil cases. See *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 129 (1994); *Georgia* v. *McCollum*, 505 U. S. 42, 59 (1992); *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 616 (1991).

Of particular relevance here, *Batson*'s holding raised several important evidentiary and procedural issues, three of which we underscore.

*First*, what factors does the trial judge consider in evaluating whether racial discrimination occurred? Our precedents allow criminal defendants raising *Batson* challenges to present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race. For example, defendants may present:

- statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
- evidence of a prosecutor's disparate questioning and

investigation of black and white prospective jurors in the case;
- side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
- relevant history of the State's peremptory strikes in past cases; or
- other relevant circumstances that bear upon the issue of racial discrimination.

See *Foster*, 578 U. S. ___; *Snyder*, 552 U. S. 472; *Miller-El II*, 545 U. S. 231; *Batson*, 476 U. S. 79.

*Second*, who enforces *Batson*? As the *Batson* Court itself recognized, the job of enforcing *Batson* rests first and foremost with trial judges. See *id.*, at 97, 99, n. 22. America's trial judges operate at the front lines of American justice. In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process.

As the *Batson* Court explained and as the Court later reiterated, once a prima facie case of racial discrimination has been established, the prosecutor must provide race-neutral reasons for the strikes. The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties. The trial judge's assessment of the prosecutor's credibility is often important. The Court has explained that "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U. S., at 477 (quotation altered). "We have recognized that these determinations of credibility and demeanor lie peculiarly within a

trial judge's province." *Ibid.* (internal quotation marks omitted). The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the State was "motivated in substantial part by discriminatory intent." *Foster*, 578 U. S., at ___ (slip op., at 23) (internal quotation marks omitted).

*Third*, what is the role of appellate review? An appeals court looks at the same factors as the trial judge, but is necessarily doing so on a paper record. "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U. S., at 98, n. 21. The Court has described the appellate standard of review of the trial court's factual determinations in a *Batson* hearing as "highly deferential." *Snyder*, 552 U. S., at 479. "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Id.,* at 477.

## III

In accord with the principles set forth in *Batson*, we now address Flowers' case.

The Constitution forbids striking even a single prospective juror for a discriminatory purpose. See *Foster*, 578 U. S., at ___ (slip op., at 9). The question for this Court is whether the Mississippi trial court clearly erred in concluding that the State was not "motivated in substantial part by discriminatory intent" when exercising peremptory strikes at Flowers' sixth trial. *Id.*, at ___ (slip op., at 23) (internal quotation marks omitted); see also *Snyder*, 552 U. S., at 477. Because this case arises on direct review, we owe no deference to the Mississippi Supreme Court, as

distinct from deference to the Mississippi trial court.

Four categories of evidence loom large in assessing the *Batson* issue in Flowers' case: (1) the history from Flowers' six trials, (2) the prosecutor's striking of five of six black prospective jurors at the sixth trial, (3) the prosecutor's dramatically disparate questioning of black and white prospective jurors at the sixth trial, and (4) the prosecutor's proffered reasons for striking one black juror (Carolyn Wright) while allowing other similarly situated white jurors to serve on the jury at the sixth trial. We address each in turn.

A

First, we consider the relevant history of the case. Recall that in *Swain*, the Court held that a defendant may prove racial discrimination by establishing a historical pattern of racial exclusion of jurors in the jurisdiction in question. Indeed, under *Swain*, that was the only way that a defendant could make out a claim that the State discriminated on the basis of race in the use of peremptory challenges.

In *Batson*, the Court ruled that *Swain* had imposed too heavy a burden on defendants seeking to prove that a prosecutor had used peremptory strikes in a racially discriminatory manner. *Batson* lowered the evidentiary burden for defendants to contest prosecutors' use of peremptory strikes and made clear that demonstrating a history of discriminatory strikes in past cases was not necessary.

In doing so, however, *Batson* did not preclude defendants from still using the same kinds of historical evidence that *Swain* had allowed defendants to use to support a claim of racial discrimination. Most importantly for present purposes, after *Batson,* the trial judge may still consider historical evidence of the State's discriminatory peremptory strikes from past trials in the jurisdiction, just

as *Swain* had allowed. After *Batson*, the defendant may still cast *Swain*'s "wide net" to gather "'relevant'" evidence. *Miller-El II*, 545 U. S., at 239–240. A defendant may rely on "all relevant circumstances." *Batson*, 476 U. S., at 96–97.

Here, our review of the history of the prosecutor's peremptory strikes in Flowers' first four trials strongly supports the conclusion that his use of peremptory strikes in Flowers' sixth trial was motivated in substantial part by discriminatory intent. (Recall that there is no record evidence from the fifth trial regarding the race of the prospective jurors.)

The numbers speak loudly. Over the course of the first four trials, there were 36 black prospective jurors against whom the State could have exercised a peremptory strike. The State tried to strike all 36. The State used its available peremptory strikes to attempt to strike every single black prospective juror that it could have struck. (At oral argument in this Court, the State acknowledged that statistic. Tr. of Oral Arg. 32.) Not only did the State's use of peremptory strikes in Flowers' first four trials reveal a blatant pattern of striking black prospective jurors, the Mississippi courts themselves concluded on two separate occasions that the State violated *Batson*. In Flowers' second trial, the trial court concluded that the State discriminated against a black juror. Specifically, the trial court determined that one of the State's proffered reasons—that the juror had been inattentive and was nodding off during jury selection—for striking that juror was false, and the trial court therefore sustained Flowers' *Batson* challenge. In Flowers' next trial—his third trial— the prosecutor used all 15 of its peremptories to strike 15 black prospective jurors. The lead opinion of the Mississippi Supreme Court stated: "The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge."

*Flowers*, 947 So. 2d, at 935. The opinion further stated that "the State engaged in racially discriminatory practices during the jury selection process" and that the "case evinces an effort by the State to exclude African-Americans from jury service." *Id.,* at 937, 939.

To summarize the most relevant history: In Flowers' first trial, the prosecutor successfully used peremptory strikes against all of the black prospective jurors. Flowers faced an all-white jury. In Flowers' second trial, the prosecutor tried again to strike all of the black prospective jurors, but the trial court decided that the State could not strike one of those jurors. The jury consisted of 11 white jurors and 1 black juror. In Flowers' third trial, there were 17 black prospective jurors. The prosecutor used 15 out of 15 peremptory strikes against black prospective jurors. After one black juror was struck for cause and the prosecutor ran out of strikes, one black juror remained. The jury again consisted of 11 white jurors and 1 black juror. In Flowers' fourth trial, the prosecutor again used 11 out of 11 peremptory strikes against black prospective jurors. Because of the large number of black prospective jurors at the trial, the prosecutor ran out of peremptory strikes before it could strike all of the black prospective jurors. The jury for that trial consisted of seven white jurors and five black jurors, and the jury was unable to reach a verdict. To reiterate, there is no available information about the race of prospective jurors in the fifth trial. The jury for that trial consisted of nine white jurors and three black jurors, and the jury was unable to reach a verdict.

Stretching across Flowers' first four trials, the State employed its peremptory strikes to remove as many black prospective jurors as possible. The State appeared to proceed as if *Batson* had never been decided. The State's relentless, determined effort to rid the jury of black individuals strongly suggests that the State wanted to try

Flowers before a jury with as few black jurors as possible, and ideally before an all-white jury. The trial judge was aware of the history. But the judge did not sufficiently account for the history when considering Flowers' *Batson* claim.

The State's actions in the first four trials necessarily inform our assessment of the State's intent going into Flowers' sixth trial. We cannot ignore that history. We cannot take that history out of the case.

B

We turn now to the State's strikes of five of the six black prospective jurors at Flowers' sixth trial, the trial at issue here. As *Batson* noted, a "'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." 476 U. S., at 97.

Flowers' sixth trial occurred in June 2010. At trial, 26 prospective jurors were presented to potentially serve on the jury. Six of the prospective jurors were black. The State accepted one black prospective juror—Alexander Robinson. The State struck the other five black prospective jurors—Carolyn Wright, Tashia Cunningham, Edith Burnside, Flancie Jones, and Dianne Copper. The resulting jury consisted of 11 white jurors and 1 black juror.

The State's use of peremptory strikes in Flowers' sixth trial followed the same pattern as the first four trials, with one modest exception: It is true that the State accepted one black juror for Flowers' sixth trial. But especially given the history of the case, that fact alone cannot insulate the State from a *Batson* challenge. In *Miller-El II*, this Court skeptically viewed the State's decision to accept one black juror, explaining that a prosecutor might do so in an attempt "to obscure the otherwise consistent pattern of opposition to" seating black jurors. 545 U. S., at 250. The overall record of this case suggests that the same tactic may have been employed here. In light of all of the

circumstances here, the State's decision to strike five of the six black prospective jurors is further evidence suggesting that the State was motivated in substantial part by discriminatory intent.

C

We next consider the State's dramatically disparate questioning of black and white prospective jurors in the jury selection process for Flowers' sixth trial. As *Batson* explained, "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." 476 U. S., at 97.

The questioning process occurred through an initial group *voir dire* and then more in-depth follow-up questioning by the prosecutor and defense counsel of individual prospective jurors. The State asked the five black prospective jurors who were struck a total of 145 questions. By contrast, the State asked the 11 seated white jurors a total of 12 questions. On average, therefore, the State asked 29 questions to each struck black prospective juror. The State asked an average of one question to each seated white juror.

One can slice and dice the statistics and come up with all sorts of ways to compare the State's questioning of excluded black jurors with the State's questioning of the accepted white jurors. But any meaningful comparison yields the same basic assessment: The State spent far more time questioning the black prospective jurors than the accepted white jurors.

The State acknowledges, as it must under our precedents, that disparate questioning can be probative of discriminatory intent. See *Miller-El* v. *Cockrell*, 537 U. S. 322, 331–332, 344–345 (2003) (*Miller-El I*). As *Miller-El I* stated, "if the use of disparate questioning is determined by race at the outset, it is likely [that] a justification for a

strike based on the resulting divergent views would be pretextual. In this context the differences in the questions posed by the prosecutors are some evidence of purposeful discrimination." *Id.,* at 344.

But the State here argues that it questioned black and white prospective jurors differently only because of differences in the jurors' characteristics. The record refutes that explanation.

For example, Dianne Copper was a black prospective juror who was struck. The State asked her 18 follow-up questions about her relationships with Flowers' family and with witnesses in the case. App. 188–190. Pamela Chesteen was a white juror whom the State accepted for the jury. Although the State asked questions of Chesteen during group *voir dire*, the State asked her no individual follow-up questions about her relationships with Flowers' family, even though the State was aware that Chesteen knew several members of Flowers' family. Compare *id.*, at 83, with *id.*, at 111. Similarly, the State asked no individual follow-up questions to four other white prospective jurors who, like Dianne Copper, had relationships with defense witnesses, even though the State was aware of those relationships. Those white prospective jurors were Larry Blaylock, Harold Waller, Marcus Fielder, and Bobby Lester.

Likewise, the State conducted disparate investigations of certain prospective jurors. Tashia Cunningham, who is black, stated that she worked with Flowers' sister, but that the two did not work closely together. To try to disprove that statement, the State summoned a witness to challenge Cunningham's testimony. *Id.*, at 148–150. The State apparently did not conduct similar investigations of white prospective jurors.

It is certainly reasonable for the State to ask follow-up questions or to investigate the relationships of jurors to the victims, potential witnesses, and the like. But white

prospective jurors who were acquainted with the Flowers' family or defense witnesses were not questioned extensively by the State or investigated. White prospective jurors who admitted that they or a relative had been convicted of a crime were accepted without apparent further inquiry by the State. The difference in the State's approaches to black and white prospective jurors was stark.

Why did the State ask so many more questions—and conduct more vigorous inquiry—of black prospective jurors than it did of white prospective jurors? No one can know for certain. But this Court's cases explain that disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race. See *Miller-El I*, 537 U. S., at 331–332, 344–345. In other words, by asking a lot of questions of the black prospective jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason—any reason—that the prosecutor can later articulate to justify what is in reality a racially motivated strike. And by not doing the same for white prospective jurors, by not asking white prospective jurors those same questions, the prosecutor can try to distort the record so as to thereby avoid being accused of treating black and white jurors differently. Disparity in questioning and investigation can produce a record that says little about white prospective jurors and is therefore resistant to characteristic-by-characteristic comparisons of struck black prospective jurors and seated white jurors. Prosecutors can decline to seek what they do not want to find about white prospective jurors.

A court confronting that kind of pattern cannot ignore it. The lopsidedness of the prosecutor's questioning and inquiry can itself be evidence of the prosecutor's objective as much as it is of the actual qualifications of the black and white prospective jurors who are struck or seated.

The prosecutor's dramatically disparate questioning of black and white prospective jurors—at least if it rises to a certain level of disparity—can supply a clue that the prosecutor may have been seeking to paper the record and disguise a discriminatory intent. See *ibid.*

To be clear, disparate questioning or investigation alone does not constitute a *Batson* violation. The disparate questioning or investigation of black and white prospective jurors may reflect ordinary race-neutral considerations. But the disparate questioning or investigation can also, along with other evidence, inform the trial court's evaluation of whether discrimination occurred.

Here, along with the historical evidence we described above from the earlier trials, as well as the State's striking of five of six black prospective jurors at the sixth trial, the dramatically disparate questioning and investigation of black prospective jurors and white prospective jurors at the sixth trial strongly suggests that the State was motivated in substantial part by a discriminatory intent. We agree with the observation of the dissenting justices of the Mississippi Supreme Court: The "numbers described above are too disparate to be explained away or categorized as mere happenstance." 240 So. 3d, at 1161 (opinion of King, J.).

D

Finally, in combination with the other facts and circumstances in this case, the record of jury selection at the sixth trial shows that the peremptory strike of at least one of the black prospective jurors (Carolyn Wright) was motivated in substantial part by discriminatory intent. As this Court has stated, the Constitution forbids striking even a single prospective juror for a discriminatory purpose. See *Foster,* 578 U. S., at ___ (slip op., at 9).

Comparing prospective jurors who were struck and not struck can be an important step in determining whether a

*Batson* violation occurred. See *Snyder*, 552 U. S., at 483–484; *Miller-El II*, 545 U. S., at 241. The comparison can suggest that the prosecutor's proffered explanations for striking black prospective jurors were a pretext for discrimination. When a prosecutor's "proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Foster*, 578 U. S., at \_\_\_ (slip op., at 23) (quotation altered). Although a defendant ordinarily will try to identify a similar white prospective juror whom the State did not strike, a defendant is not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent. *Miller-El II*, 545 U. S., at 247, n. 6.

In this case, Carolyn Wright was a black prospective juror who said she was strongly in favor of the death penalty as a general matter. And she had a family member who was a prison security guard. Yet the State exercised a peremptory strike against Wright. The State said it struck Wright in part because she knew several defense witnesses and had worked at Wal-Mart where Flowers' father also worked.

Winona is a small town. Wright had some sort of connection to 34 people involved in Flowers' case, both on the prosecution witness side and the defense witness side. See, 240 So. 3d, at 1126. But three white prospective jurors—Pamela Chesteen, Harold Waller, and Bobby Lester—also knew many individuals involved in the case. Chesteen knew 31 people, Waller knew 18 people, and Lester knew 27 people. See *ibid.* Yet as we explained above, the State did not ask Chesteen, Waller, and Lester individual follow-up questions about their connections to witnesses. That is a telling statistic. If the State were concerned about prospective jurors' connections to witnesses in the case, the State presumably would have used

individual questioning to ask those potential white jurors whether they could remain impartial despite their relationships. A "State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El II*, 545 U. S., at 246 (internal quotation marks omitted).

Both Carolyn Wright and Archie Flowers, who is the defendant's father, had worked at the local Wal-Mart. But there was no evidence that they worked together or were close in any way. Importantly, the State did not ask individual follow-up questions to determine the nature of their relationship. And during group questioning, Wright said she did not know whether Flowers' father still worked at Wal-Mart, which "supports an inference that Wright and Flowers did not have a close working relationship." 240 So. 3d, at 1163 (King, J., dissenting). And white prospective jurors also had relationships with members of Flowers' family. Indeed, white prospective juror Pamela Chesteen stated that she had provided service to Flowers' family members at the bank and that she knew several members of the Flowers family. App. 83. Likewise, white prospective juror Bobby Lester worked at the same bank and also encountered Flowers' family members. *Id.*, at 86. Although Chesteen and Lester were questioned during group *voir dire*, the State did not ask Chesteen or Lester individual follow-up questions in order to explore the depth of their relationships with Flowers' family. And instead of striking those jurors, the State accepted them for the jury. To be sure, both Chesteen and Lester were later struck by the defense. But the State's acceptance of Chesteen and Lester necessarily informs our assessment of the State's intent in striking similarly situated black prospective jurors such as Wright.

The State also noted that Wright had once been sued by Tardy Furniture for collection of a debt 13 years earlier.

*Id.*, at 209.  Wright said that the debt was paid off and that it would not affect her evaluation of the case.  *Id.*, at 71, 90–91.  The victims in this case worked at Tardy Furniture.  But the State did not explain how Wright's 13-year-old, paid-off debt to Tardy Furniture could affect her ability to serve impartially as a juror in this quadruple murder case.  The "State's unsupported characterization of the lawsuit is problematic."  240 So. 3d, at 1163 (King, J., dissenting).  In any event, the State did not purport to rely on that reason alone as the basis for the Wright strike, and the State in this Court does not rely on that reason alone in defending the Wright strike.

The State also explained that it exercised a peremptory strike against Wright because she had worked with one of Flowers' sisters.  App. 209.  That was incorrect.  The trial judge immediately stated as much.  *Id.*, at 218–219.  But incorrect statements of that sort may show the State's intent: When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent.

That incorrect statement was not the only one made by the prosecutor.  The State made apparently incorrect statements to justify the strikes of black prospective jurors Tashia Cunningham, Edith Burnside, and Flancie Jones.  The State contradicted Cunningham's earlier statement that she had only a working relationship with Flowers' sister by inaccurately asserting that Cunningham and Flowers' sister were close friends. See *id.*, at 84, 220.  The State asserted that Burnside had tried to cover up a Tardy Furniture suit.  See *id.*, at 226.  She had not.  See *id.*, 70–71.  And the State explained that it struck Jones in part because Jones was Flowers' aunt.  See *id.,* at 229.  That, too, was not true.  See *id.*, at 86–88.  The State's pattern of factually inaccurate statements about black prospective jurors suggests that the State intended to keep black prospective jurors off the jury.  See *Foster*, 578 U. S., at

___ (slip op., at 23); *Miller-El II*, 545 U. S., at 240, 245.

To be sure, the back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination. But when considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling. So it is here.

The side-by-side comparison of Wright to white prospective jurors whom the State accepted for the jury cannot be considered in isolation in this case. In a different context, the Wright strike might be deemed permissible. But we must examine the whole picture. Our disagreement with the Mississippi courts (and our agreement with Justice King's dissent in the Mississippi Supreme Court) largely comes down to whether we look at the Wright strike in isolation or instead look at the Wright strike in the context of all the facts and circumstances. Our precedents require that we do the latter. As Justice King explained in his dissent in the Mississippi Supreme Court, the Mississippi courts appeared to do the former. 240 So. 3d, at 1163–1164. As we see it, the overall context here requires skepticism of the State's strike of Carolyn Wright. We must examine the Wright strike in light of the history of the State's use of peremptory strikes in the prior trials, the State's decision to strike five out of six black prospective jurors at Flowers' sixth trial, and the State's vastly disparate questioning of black and white prospective jurors during jury selection at the sixth trial. We cannot just look away. Nor can we focus on the Wright strike in isolation. In light of all the facts and circumstances, we conclude that the trial court clearly erred in ruling that the State's peremptory strike of Wright was not motivated in substantial part by discriminatory intent.

\*     \*     \*

In sum, the State's pattern of striking black prospective jurors persisted from Flowers' first trial through Flowers' sixth trial. In the six trials combined, the State struck 41 of the 42 black prospective jurors it could have struck. At the sixth trial, the State struck five of six. At the sixth trial, moreover, the State engaged in dramatically disparate questioning of black and white prospective jurors. And it engaged in disparate treatment of black and white prospective jurors, in particular by striking black prospective juror Carolyn Wright.

To reiterate, we need not and do not decide that any one of those four facts alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial court at Flowers' sixth trial committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not motivated in substantial part by discriminatory intent. In reaching that conclusion, we break no new legal ground. We simply enforce and reinforce *Batson* by applying it to the extraordinary facts of this case.

We reverse the judgment of the Supreme Court of Mississippi, and we remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–9572

_____

## CURTIS GIOVANNI FLOWERS, PETITIONER
## *v.* MISSISSIPPI

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MISSISSIPPI

[June 21, 2019]

JUSTICE ALITO, concurring.

As the Court takes pains to note, this is a highly unusual case. Indeed, it is likely one of a kind. In 1996, four defenseless victims, three white and one black, were slaughtered in a furniture store in a small town in Montgomery County, Mississippi, a jurisdiction with fewer than 11,000 inhabitants. One of the victims was the owner of the store, which was widely frequented by residents of the community. The person prosecuted for this crime, petitioner Curtis Flowers, an African-American, comes from a local family whose members make up a gospel group and have many community ties.

By the time jury selection began in the case now before us, petitioner had already been tried five times for committing that heinous and inflammatory crime. Three times, petitioner was convicted and sentenced to death, but all three convictions were reversed by the State Supreme Court. Twice, the jurors could not reach a unanimous verdict. In all of the five prior trials, the State was represented by the same prosecutor, and as the Court recounts, many of those trials were marred by racial discrimination in the selection of jurors and prosecutorial misconduct. Nevertheless, the prosecution at the sixth trial was led by the same prosecutor, and the case was tried in Montgomery County where, it appears, a high

percentage of the potential jurors have significant connections to either petitioner, one or more of the victims, or both.

These connections and the community's familiarity with the case were bound to complicate a trial judge's task in trying to determine whether the prosecutor's asserted reason for striking a potential juror was a pretext for racial discrimination, and that is just what occurred. Petitioner argues that the prosecution improperly struck five black jurors, but for each of the five, the prosecutor gave one or more reasons that were not only facially legitimate but were of a nature that would be of concern to a great many attorneys. If another prosecutor in another case in a larger jurisdiction gave any of these reasons for exercising a peremptory challenge and the trial judge credited that explanation, an appellate court would probably have little difficulty affirming that finding. And that result, in all likelihood, would not change based on factors that are exceedingly difficult to assess, such as the number of *voir dire* questions the prosecutor asked different members of the venire.

But this is not an ordinary case, and the jury selection process cannot be analyzed as if it were. In light of all that had gone before, it was risky for the case to be tried once again by the same prosecutor in Montgomery County. Were it not for the unique combinations of circumstances present here, I would have no trouble affirming the decision of the Supreme Court of Mississippi, which conscientiously applied the legal standards applicable in less unusual cases. But viewing the totality of the circumstances present here, I agree with the Court that petitioner's capital conviction cannot stand.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–9572

_____

## CURTIS GIOVANNI FLOWERS, PETITIONER
## _v._ MISSISSIPPI

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
MISSISSIPPI

[June 21, 2019]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins as to Parts I, II, and III, dissenting.

On a summer morning in July 1996 in Winona, Mississippi, 16-year-old Derrick "Bobo" Stewart arrived for the second day of his first job. He and Robert Golden had been hired by the Tardy Furniture store to replace petitioner Curtis Flowers, who had been fired a few days prior and had his paycheck docked for damaging store property and failing to show up for work. Another employee, Sam Jones, Jr., planned to teach Stewart and Golden how to properly load furniture.

On Jones' arrival, he found a bloodbath. Store owner Bertha Tardy and bookkeeper Carmen Rigby had each been murdered with a single gunshot to the head. Golden had been murdered with two gunshots to the head, one at very close range. And Stewart had been shot, execution style, in the back of his head. When Jones entered the store, Stewart was fighting for every breath, blood pouring over his face. He died a week later.

On the morning of the murders, a .380-caliber pistol was reported stolen from the car of Flowers' uncle, and a witness saw Flowers by that car before the shootings. Officers recovered .380-caliber bullets at Tardy Furniture and matched them to bullets fired by the stolen pistol. Gunshot residue was found on Flowers' hand a few hours after

the murders.   A bloody footprint found at the scene
matched both the size of Flowers' shoes and the shoe style
that he was seen wearing on the morning of the murders.
Multiple witnesses placed Flowers near Tardy Furniture
that morning, and Flowers provided inconsistent accounts
of his whereabouts.  Several hundred dollars were missing
from the store's cash drawer, and $235 was found hidden
in Flowers' headboard after the murders.  240 So. 3d 1082,
1092–1095, 1107 (Miss. 2017).

In the 2010 trial at issue here, Flowers was convicted of
four counts of murder and sentenced to death.  Applying
heightened scrutiny, the state courts found that the evi-
dence was more than sufficient to convict Flowers, that he
was tried by an impartial jury, and that the State did not
engage in purposeful race discrimination in jury selection
in violation of the Equal Protection Clause.  *Id.,* at 1096,
1113, 1139, 1135.

The Court today does not dispute that the evidence was
sufficient to convict Flowers or that he was tried by an
impartial jury.  Instead, the Court vacates Flowers' con-
victions on the ground that the state courts clearly erred
in finding that the State did not discriminate based on
race when it struck Carolyn Wright from the jury.

The only clear errors in this case are committed by
today's majority.  Confirming that we never should have
taken this case, the Court almost entirely ignores—and
certainly does not refute—the race-neutral reasons given
by the State for striking Wright and four other black
prospective jurors.  Two of these prospective jurors knew
Flowers' family and had been sued by Tardy Furniture—
the family business of one of the victims and also of one of
the trial witnesses.  One refused to consider the death
penalty and apparently lied about working side-by-side
with Flowers' sister.  One was related to Flowers and lied
about her opinion of the death penalty to try to get out of
jury duty.  And one said that because she worked with two

of Flowers' family members, she might favor him and would not consider only the evidence presented. The state courts' findings that these strikes were not based on race are the opposite of clearly erroneous; they are clearly correct. The Court attempts to overcome the evident race neutrality of jury selection in this trial by pointing to a supposed history of race discrimination in previous trials. But 49 of the State's 50 peremptory strikes in Flowers' previous trials were race neutral. The remaining strike occurred 20 years ago in a trial involving only one of Flowers' crimes and was never subject to appellate review; the majority offers no plausible connection between that strike and Wright's.

Today's decision distorts the record of this case, eviscerates our standard of review, and vacates four murder convictions because the State struck a juror who would have been stricken by any competent attorney. I dissent.

## I

Twice now, the Court has made the mistake of granting this case. The first time, this case was one of three that the Court granted, vacated, and remanded in light of *Foster* v. *Chatman*, 578 U. S. \_\_\_ (2016), which involved a challenge under *Batson* v. *Kentucky*, 476 U. S. 79 (1986). See *Flowers* v. *Mississippi*, 579 U. S. \_\_\_ (2016). But "*Foster* did not change or clarify the *Batson* rule in any way," so remanding was senseless and unproductive: "Without pointing out any errors in the State Supreme Court's analysis" or bothering to explain how *Foster* was relevant, "the [Court] simply order[ed] the State Supreme Court to redo its work." *Flowers*, 579 U. S., at \_\_\_, \_\_\_ (ALITO, J., dissenting) (slip op., at 1, 4).

Unsurprisingly, no one seemed to understand *Foster*'s relevance on remand. The defendants simply "re-urge[d] the arguments [they] had raised" before, and all three courts promptly reinstated their prior decisions—

confirming the impropriety of the entire enterprise. 240 So. 3d, at 1117–1118, 1153; *State* v. *Williams*, 2013–0283 (La. App. 4 Cir. 9/7/16), 199 So. 3d 1222, 1230, 1238 (pointing out that "*Foster* did not change the applicable principles for analyzing a *Batson* claim"); *Ex parte Floyd*, 227 So. 3d 1, 13 (Ala. 2016).

Flowers then filed another petition for certiorari, raising the same question as his first petition: whether a prosecutor's history of *Batson* violations is irrelevant when assessing the credibility of his proffered explanations for peremptory strikes. Under our ordinary certiorari criteria, we would never review this issue. There is no disagreement among the lower courts on this question, and the question is not implicated by this case—the Mississippi Supreme Court *did* consider the prosecutor's history, see 240 So. 3d, at 1122–1124, 1135, and, to the extent there is a relevant history here, it is one of race-*neutral* strikes, see Part III, *infra.*

Nonetheless, Flowers' question presented at least had the virtue of being a question of law that could affect *Batson*'s application. Unchastened by its *Foster* remand, however, the Court granted certiorari and changed the question presented to ask merely whether the Mississippi Supreme Court had misapplied *Batson* in this particular case. In other words, the Court tossed aside any pretense of resolving a legal question so it could reconsider the factual findings of the state courts. In so doing, the Court disregards the rule that "[w]e do not grant a certiorari to review evidence and discuss specific facts," *United States* v. *Johnston*, 268 U. S. 220, 227 (1925), particularly where there are "'concurrent findings of fact by two courts below,'" *Exxon Co., U. S. A.* v. *Sofec, Inc.*, 517 U. S. 830, 841 (1996).

The Court does not say why it disregarded our traditional criteria to take this case. It is not as if the Court lacked better options. See *Gee* v. *Planned Parenthood of*

*Gulf Coast, Inc.*, 586 U. S. \_\_\_ (2018) (THOMAS, J., dissenting from denial of certiorari). Perhaps the Court lacked confidence in the proceedings below. Flowers' case, like the others needlessly remanded in light of *Foster*, comes to us from a state court in the South. These courts are "familiar objects of the Court's scorn," *United States* v. *Windsor*, 570 U. S. 744, 795 (2013) (Scalia, J., dissenting), especially in cases involving race.[1]

Or perhaps the Court granted certiorari because the case has received a fair amount of media attention. But if so, the Court's action only encourages the litigation and relitigation of criminal trials in the media, to the potential detriment of all parties—including defendants. The media often seeks "to titillate rather than to educate and inform." *Chandler* v. *Florida*, 449 U. S. 560, 580 (1981). And the Court has "long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial," by "influenc[ing] public opinion" and "inform[ing] potential jurors of . . . information wholly inadmissible at the actual trial." *Gannett Co.* v. *DePasquale*, 443 U. S. 368, 378 (1979); *e.g., Sheppard* v. *Maxwell*, 384 U. S. 333, 356–363 (1966); *Irvin* v. *Dowd*, 366 U. S. 717, 725–728 (1961). Media attention can produce other dangers, too, including discouraging reluctant witnesses from testifying and encouraging eager witnesses, prosecutors, defense counsel, and even judges to perform for the audience. See *Estes* v. *Texas*, 381 U. S. 532, 591 (1965) (Harlan, J., concurring). Any appearance that this Court gives closer scrutiny to cases with significant media attention will only exacerbate these problems and undermine the fairness of criminal trials.

——————

[1] *E.g., Tharpe* v. *Sellers*, 583 U. S. \_\_\_ (2018) (*per curiam*); *Buck* v. *Davis*, 580 U. S. \_\_\_ (2017); *Foster* v. *Chatman*, 578 U. S. \_\_\_ (2016); *In re Davis*, 557 U. S. 952 (2009); *Snyder* v. *Louisiana*, 552 U. S. 472 (2008).

Whatever the Court's reason for taking this case, we should have dismissed it as improvidently granted. If the Court wanted to simply review the state courts' application of *Batson*, it at least could have had the decency to do so the first time around. Instead, the Court wasted the State's, defendant's, and lower court's time and resources—to say nothing of prolonging the ongoing "'nightmare'" of Bobo Stewart's and the other victims' families as they await justice. Tr. 3268–3272. And now, the majority considers it a point of pride to "break no new legal ground," *ante,* at 3, 31, and proceeds to second-guess the factual findings of two different courts on matters wholly collateral to the merits of the conviction. If nothing else, its effort proves the reason behind the rule that we do not take intensively fact-specific cases.

## II

The majority's opinion is so manifestly incorrect that I must proceed to the merits. Flowers presented no evidence whatsoever of purposeful race discrimination by the State in selecting the jury during the trial below. Each of the five challenged strikes was amply justified on race-neutral grounds timely offered by the State at the *Batson* hearing. None of the struck black jurors was remotely comparable to the seated white jurors. And nothing else about the State's conduct at jury selection—whether trivial mistakes of fact or supposed disparate questioning—provides any evidence of purposeful discrimination based on race.

### A

#### 1

The majority focuses its discussion on potential juror Carolyn Wright, but the State offered multiple race-neutral reasons for striking her. To begin, Wright lost a lawsuit to Tardy Furniture soon after the murders, and a

garnishment order was issued against her. App. 71–72; Record 2697. Noting that Wright claimed the lawsuit "would not affect her evaluation of the case," the majority questions how this lawsuit "could affect [Wright's] ability to serve impartially." *Ante,* at 29. But the potential bias is obvious. The "victims in this case" did not merely "wor[k] at Tardy Furniture." *Ibid.* At the time of the murders, Bertha Tardy owned Tardy Furniture. Following her murder, her daughter and son-in-law succeeded her as owners; they sued Wright, and the daughter testified at this trial. See App. 71, 209; 240 So. 3d, at 1093; Tr. 1656. Neither the trial court nor Flowers suffered from any confusion as to how losing a lawsuit to a trial witness and daughter of a victim might affect a juror. See App. 280, and n. 2; Recording of Oral Arg. 13:40–13:47 in No. 2010–DP–01328–SCT (Miss., July 14, 2014) (Flowers' counsel arguing that "'the potential jurors who were sued by'" Tardy had more "'basis for being upset with her'" than Flowers did), https://judicial.mc.edu/case. php?id=1122570. Indeed, a portion of the daughter's testimony focused on obtaining judgments and garnishments against customers who did not pay off their accounts. Tr. 2672–2674.

Faced with this strong race-neutral reason for striking Wright, the majority first suggests that the State did not adequately explain how the lawsuit could affect Wright. But it is obvious, and in any event the majority is wrong— the State *did* spell it out. See App. 209 ("'She was sued by Tardy Furniture, after these murders, by the family members that will be testifying here today'"). Moreover, Flowers did not ask for further explanation, instead claiming that "'there is no evidence of an actual lawsuit,'" *id.,* at 211, even though Wright had admitted it, *id.,* at 71–72. The State then entered into the record a copy of the judgment containing a garnishment amount. *Id.,* at 215; see Record 2697.

Second, the majority quotes the dissent below for the proposition that the "'State's unsupported characterization of the lawsuit is problematic.'" *Ante,* at 29. But the Court neglects to mention that the dissent's basis for this statement was that "[n]othing in the record supports the contention that Wright's wages were garnished." 240 So. 3d, at 1162 (King, J., dissenting). Again, that is incorrect. See Record 2697.

Finally, the majority dismisses the lawsuit's significance because "the State did not purport to rely on that reason *alone* as the basis for the Wright strike." *Ante,* at 29 (emphasis added). But the fact that the State had *additional* race-neutral reasons to strike Wright does not make the lawsuit any less of a race-neutral reason. As the State explained, Wright knew nearly every defense witness and had worked with Flowers' father at what the trial court described as the "'smallest Wal-Mart . . . that I know in existence.'" App. 218. The majority tries to minimize this connection by pointing out that "Wright said she did not know whether Flowers' father still worked at Wal-Mart." *Ante,* at 28. That is understandable, given that Wright testified that *she* no longer worked at the Wal-Mart. Tr. 782. The majority misses the point: Wright had worked in relatively close proximity with the defendant's father.[2]

2

The majority, while admonishing trial courts to "consider the prosecutor's race-neutral explanations," *ante,* at 17, completely ignores the State's race-neutral explanations for striking the other four black jurors.

Tashia Cunningham stated repeatedly that she

_____

[2] The majority also complains that the State did not ask enough "follow-up questions" of Wright. *Ante,* at 28. I see no reason why the State needed more information. Besides, if the State *had* asked more questions, the majority would complain that the State engaged in "dramatically disparate" questioning of Wright.

"'d[id]n't believe in the death penalty'" and would "'not even consider'" it. App. 129; see 2d Supp. Record 256b. When pressed by the trial court on this point, she vacillated, saying that she "'d[id]n't think'" she could consider the death penalty but then, "'I might. I might. I don't know. I might.'" App. 130. Opposition to the death penalty is plainly a valid, race-neutral reason for a strike. Moreover, Cunningham knew Flowers' sister, having worked with her on an assembly line for several years. *Id.,* at 83–85. She testified that they did not work in close proximity, but a supervisor testified that they actually worked "'side by side.'" *Id.,* at 149–152. Both this apparent misstatement and the fact that Cunningham worked with Flowers' sister are valid, race-neutral reasons.

Next, Edith Burnside knew Flowers personally. Flowers had visited in her home, lived one street over, and played basketball with her sons. *Id.,* at 75, 79–80. Burnside also testified repeatedly that she "'could not judge anyone,'" no "'matter what the case was,'" *id.,* at 69–70, 143–144, and that her "'problem with judging'" could "'affect [her] judgment'" here, *id.,* at 144. Finally, she too was sued by Tardy Furniture soon after the murders, and a garnishment order was entered against her. See *id.,* at 71, 141–142; *Tardy Furniture Co.* v. *Burnside*, Civ. No. 1359 (Justice Ct. Montgomery Cty., Miss., June 23, 1997), Dkt. 13, p. 553.

Next, Dianne Copper had worked with both Flowers' father and his sister for "'a year or two'" each. App. 77, 189, 234, 236. She agreed that because of these relationships and others with various defense witnesses, she might "'lean toward'" Flowers and would be unable to "'come in here . . . with an open mind.'" *Id.,* at 190; see *id.,* at 78. She also said that deciding the case on "'the evidence only'" would make her "'uncomfortable.'" *Id.,* at 191–192.

Finally, as to Flancie Jones, Flowers conceded below

that he "did not challenge [her] strike" and that "'the State's bases for striking Jones appear to be race neutral.'" Supp. Brief for Appellant in No. 2010–DP–01348–SCT (Miss.), p. 20, n. 12. Because any argument as to Jones "was not raised below, it is waived." *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 56, n. 4 (2002). Even if Flowers had not waived this argument, this strike was obviously supported by race-neutral reasons. Jones was related to Flowers in several ways. See App. 73, 179. She was late to court on multiple occasions. *Id.,* at 180, 182. On her juror questionnaire, she said she was "'strongly against the death penalty,'" but when asked about her opposition, said, "'I guess I'd say anything to get off'" jury duty. *Id.,* at 181; see 2d Supp. Record 325b. She then admitted that she was not necessarily "being truthful" on her questionnaire but refused to provide her actual view on the death penalty, saying, "'I—really and truly . . . don't want to be here.'" App. 181–182.

3

In terms of race-neutral validity, these five strikes are not remotely close calls. Each strike was supported by multiple race-neutral reasons articulated by the State at the *Batson* hearing and supported by the record. It makes a mockery of *Batson* for this Court to tell prosecutors to "provide race-neutral reasons for the strikes," and to tell trial judges to "consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances," *ante,* at 17, and then completely ignore the State's reasons for four out of five strikes.

Only by ignoring these facts can the Court assert that "the State's decision to strike five of the six black prospective jurors is further evidence suggesting that the State was motivated in substantial part by discriminatory intent." *Ante,* at 23. Putting aside the fact that the majority has its numbers wrong (the State struck five of seven

potential black jurors),[3] the bare numbers are meaningless outside the context of the *reasons* for the strikes. The majority has no response whatsoever to the State's race-neutral explanations and, for four of the five strikes, does not dispute the state courts' conclusion that race played no role at all. For *Batson* purposes, these strikes might as well have been exercised against white jurors. Yet the majority illegitimately counts them all against the State.

B

Given the multiple race-neutral reasons for the State's strikes, evidence of racial discrimination would have to be overwhelming to show a *Batson* violation. The majority's evidence falls woefully short.

As the majority explains, "comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred." *Ante,* at 26–27. For example, "[w]hen a prosecutor's 'proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination.'" *Ante*, at 27. By the same token, a defendant's failure to find any similarly-situated whites permitted to serve tends to disprove purposeful discrimination. Here, neither the majority nor Flowers has identified any nonstruck white jurors remotely similar to any of the struck black jurors.

The majority points to white jurors Pamela Chesteen and Bobby Lester, who worked at the Bank of Winona and therefore had interacted with several members of Flowers' family as bank customers. By the majority's lights, Ches-

---

[3] The majority ignores the fact that, after the initial *Batson* challenge, the State tendered a black juror as an alternate instead of exercising available peremptory strikes. The State also tendered the first black juror available. This is hardly a "'consistent pattern'" of strikes against black jurors. *Ante*, at 22.

teen's and Lester's banker-customer relationship was the same as Wright's co-worker relationship with Flowers' father. *Ante,* at 27–28. That comparison is untenable. Lester testified that working at the bank meant he and Chesteen "'s[aw] everyone in town.'" App. 86. And as the trial court explained, "a bank teller, who waits on customers at a bank," has a "substantially different" relationship from someone who "work[s] at the same business establishment with members of the defendant's family." *Id.,* at 278; see *id.,* at 236. The Mississippi Supreme Court agreed that "a coworker relationship" and "employee/ customer relationship are distinguishable." 240 So. 3d, at 1127. The majority mentions none of this, evidently relying on its superior knowledge of the banker-customer relationships at the Bank of Winona.

The more relevant comparator to Chesteen and Lester is Alexander Robinson, a black man who was a customer at a store where Flowers' brother worked. App. 82. The State confirmed with Robinson that this relationship was "'just a working relationship'"—*i.e.,* an employee-customer relationship—and immediately thereafter clarified with Chesteen and Lester that their relationships with Flowers' family members was "'like Mr. Robinson, just a working relationship.'" *Id.,* at 82–83, 85–86.[4] The State then tendered Robinson, Chesteen, and Lester as jurors. *Id.,* at 203, 208. Later, the State would strike black jurors Wright and Copper, who were both co-workers of members of Flowers' family. As the trial court understood, it is "evident . . . that the prosecution utilized peremptory strikes only against those individuals who actually worked with, or who in the past had worked with, members of Flowers' family." *Id.,* at 278; see *id.,* at 279.

—————

[4] Thus, the majority is simply wrong to complain that the State failed to ask Chesteen or Lester "individual follow-up questions" on this issue. *Ante,* at 28.

Next, the majority contends that white jurors Chesteen, Lester, and Harold Waller, like Wright, "knew many individuals involved in the case." *Ante,* at 27. Yet the majority concedes that Wright knew more individuals than any of them. And the more relevant statistic from the State's perspective is how many *defense* witnesses a juror knows, since that knowledge suggests a greater connection to the defendant. By Flowers' own count, Wright knew substantially more defense witnesses than the three white jurors. According to Flowers, Wright knew 19 defense witnesses, while Chesteen knew 14 and Lester and Waller knew around 6 each. See Brief for Petitioner 49, n. 37; Brief for Appellant in No. 2010–DP–01348–SCT (Miss.), p. 114.

Additional relevant differences existed between Wright and the three white jurors. Wright had been *sued* by a witness and member of the victim's family, and worked at the same store as the defendant's father. Chesteen, on the other hand, was *friends* with the same member of the victim's family and also knew another victim's wife. App. 93–94, 46. The trial court found that Chesteen "had a much closer relationship with members of the victim[s'] families tha[n] she had with anyone in Flowers' family." *Id.,* at 278.

Likewise, Waller knew victim Carmen Rigby and her husband; their children attended school with his daughter, and "'[t]hey were involved in school activities together.'" Tr. 821, 1042. He served on the school board with Rigby. *Id.,* at 1043. And victim Bobo Stewart "'went to school with [Waller's] daughter,'" and Waller knew his family. App. 48, 53.

Similarly, Lester had been friends with Rigby's husband "'for years,'" and he "'knew her family.'" Tr. 822, 1045. Lester's wife taught Stewart first grade. App. 48; Tr. 1045. Lester was related by marriage to Bertha Tardy and had known the Tardy family his entire life, growing

up with Bertha's daughter. *Id.,* at 787–788. His daughter
had just graduated with Bertha's grandson, and they were
friends. *Id.,* at 788, 1046. As Lester put it, "'I have a lot
of connections to the [victims'] families.'" *Id.,* at 788.

Given that these prospective jurors were favorable for
the State, it is hardly surprising that the State would not
affirmatively "us[e] individual questioning to ask th[e]se
potential white jurors whether they could remain impar-
tial despite their relationships" with victims' families or
prosecution witnesses, *ante,* at 27–28, for to do so could
invite defense strikes. Revealingly, Flowers' counsel had
exhaustively questioned these three white jurors—
treating them much differently than Wright. Flowers'
counsel asked Wright only a handful of questions, all of
which sought to confirm that she could judge impartially.
App. 90–91, 105–106. By contrast, Flowers' counsel asked
Chesteen more than 30 questions, most of which sought to
cast doubt on Chesteen's ability to remain impartial given
her relationships with the victims' families. *Id.,* at 93–95,
111–118. Flowers' counsel asked Lester more than 60
questions and Waller about 15 questions along the same
lines. Tr. 1045–1047; App. 160–174; Tr. 1042–1044; App.
123–124. Flowers was so concerned about these white
jurors' connections with the victims that he tried to strike
both Chesteen and Lester—but not Wright—for cause, and
when that failed, he exercised peremptory strikes on all
three white jurors. Tr. 1622, 1624, 1743–1744; App. 204,
208; see *id.,* at 278.

In short, no reasonable litigant or trial court would
consider Wright "similarly situated," *ante,* at 28, to these
three white jurors.

## C

The majority next discovers "clue[s]" of racial discrimi-
nation in minor factual mistakes supposedly made by the
State during the *Batson* hearing. *Ante,* at 29–30. As an

initial matter, Flowers forfeited this argument by failing to present it to the trial court. Under *Batson*, the trial court must decide whether, "*in light of the parties' submissions*," "the defendant has shown purposeful discrimination." *Snyder* v. *Louisiana*, 552 U. S. 472, 477 (2008) (emphasis added; internal quotation marks omitted). The Court has made clear that "a prosecutor simply has got to state his reasons as best he can [at the *Batson* hearing] and stand or fall on the plausibility of the reasons he gives." *Miller-El* v. *Dretke*, 545 U. S. 231, 252 (2005).

The same rule must apply to the defendant, the party with the ultimate burden of proving purposeful discrimination. *Johnson* v. *California*, 545 U. S. 162, 170–171 (2005); *Batson*, 476 U. S., at 96–98. Thus, if the defendant makes no argument on a particular point, the trial court's failure to consider that argument cannot be erroneous, much less clearly so. See, *e.g.*, *Davis* v. *Baltimore Gas and Elec. Co.*, 160 F. 3d 1023, 1027–1028 (CA4 1998); *Wright* v. *Harris County*, 536 F. 3d 436, 438 (CA5 2008). Excusing the defendant from making his arguments before the trial court encourages defense counsel to remain silent, prevents the State from responding, deprives the trial court of relevant arguments, and denies reviewing courts a sufficient record. See *Snyder*, *supra,* at 483; *Garraway* v. *Phillips*, 591 F. 3d 72, 76–77 (CA2 2010).[5]

Even if Flowers had not forfeited his argument about the State's "mistakes," it is devoid of merit. The *Batson* hearing was conducted immediately after *voir dire*, before a transcript was available. App. 214; *id.,* at 225–226. In

———————

[5] At a minimum, Mississippi has reasonably read *Batson*'s "'prophylactic framework,'" *Johnson* v. *California*, 545 U. S. 162, 174 (2005) (THOMAS, J., dissenting), to mean that the party making a *Batson* claim forfeits arguments not made to the trial court. See *Pitchford* v. *State*, 45 So. 3d 216, 227–228 (Miss. 2010); accord, Record 2965. Thus, whether as a matter of *Batson* itself or the State's implementation of *Batson*, Flowers forfeited these arguments.

explaining their strikes, counsel relied on handwritten notes taken during a fast-paced, multiday *voir dire* involving 156 potential jurors. *Id.,* at 229, 258. Still, the majority comes up with only a few mistakes, and they are either imagined or utterly trivial. The majority claims that the State incorrectly "asserted that Burnside"—one of the struck black jurors—"had tried to cover up a Tardy Furniture suit." *Ante,* at 29. But the State's assertion was at least reasonable. When the State asked Burnside about the lawsuit, she responded that "'[i]t wasn't a dispute'" and "'[w]e never had no misunderstanding about it.'" App. 141–142. Quite reasonably, the State asked why the matter ended up in court, and Burnside conceded that she had to be sued, even as she insisted that there "'was no falling-out about it.'" *Id.,* at 142. As previously explained, a judgment and garnishment were issued against her.

The majority's other supposed mistakes are inconsequential. First, the State confused which potential juror worked with Flowers' sister, and then corrected its mistake. See *id.,* at 218–219, 234. Second, the State referred to that juror, Tashia Cunningham, as "'a close friend'" of Flowers' sister, whereas the testimony established only that they worked together closely. *Id.,* at 220. Flowers *agreed* with the "'friendship'" characterization during the *Batson* hearing, *id.,* at 221, and in any event, whether Cunningham and Flowers' sister were close co-workers or close friends is irrelevant. Third, the State confused struck juror Flancie Jones' familial relationships with Flowers, saying that Flowers' sister was Jones' niece, when in fact Flowers' sister was apparently married to Jones' nephew. *Id.,* at 229, 231. But whatever the precise relationship, even Flowers conceded that Jones had an "'in-law relationship to the entire [Flowers] family,'" so the relevant point remained: Jones was related in multiple ways to Flowers. *Id.,* at 230–231; Tr. 967–968. It is hard to imagine less significant "mistakes."

Tellingly, Flowers' counsel, although aided by "'many interns,'" App. 214, made many more mistakes during this process. *E.g., id.,* at 204–205 (incorrectly identifying a juror); *id.,* at 207–208 (striking a juror and then immediately making an argument premised on not striking that juror); *id.,* at 210 (confusing jurors); *id.,* at 211 (confusing which family members were acquainted with a juror); *id.,* at 212 (incorrectly stating that no general question was asked of all jurors as to accounts or suits with the Tardys, see *id.,* at 70, 217); *id.,* at 222–223 (confusing jurors); *id.,* at 230 ("'[M]aybe we didn't get to this juror'").[6]

In short, in the context of the trial below, a few trivial errors on secondary or tertiary race-neutral reasons for striking some jurors can hardly be counted as "telling" evidence of race discrimination. *Ante,* at 30; see *ibid.* ("[M]istaken explanations should not be confused with racial discrimination").

———————

[6] These mistakes continued before this Court. Flowers asserts that in his first four trials, the State "struck every black panelist that [it] could," Brief for Petitioner 23; that is false. See *infra*, at 30. Flowers says that the State asked potential juror Robinson "a total of five questions," Brief for Petitioner 15, n. 14, but it actually asked 10. See App. 82–83; Tr. 1147–1148. Flowers says that the State "did not question [Robinson] on [his] relationship" with Flowers' brother, Brief for Petitioner 46, n. 35; it did. See App. 82–83. Flowers refers to Bertha Tardy's "son," Brief for Petitioner 52, but Tardy's only child was a daughter. See Tr. 3268. Flowers says that "the Mississippi Supreme Court found two clear *Batson* violations" in the third trial, Brief for Petitioner 32; it did not. See *infra*, at 28–29. Flowers repeatedly refers to "the decidedly false claim that Wright's" and Burnside's "wages had been garnished," Brief for Petitioner 56, 50, 18, 22, n. 24, 51; Tr. of Oral Arg. 8, 11, 12, even though that claim is true. See *supra,* at 6–9. Flowers said that Wright "still work[ed]" at Wal-Mart at the time of jury selection, Tr. of Oral Arg. 16; she did not. Tr. 782. Flowers agreed that in this trial, the State struck "every black juror that was available on the panel" after "the first one," Tr. of Oral Arg. 57–58; Reply Brief 1, but it did not. See App. 241 (tendering a black juror as an alternate).

## D

Turning to even less probative evidence, the majority asserts that the State engaged in disparate— "dramatically disparate," the majority repeats, *ante,* at 2, 19, 23, 26, 31—questioning based on race. By the majority's count, "[t]he State asked the five black prospective jurors who were struck a total of 145 questions" and "the 11 seated white jurors a total of 12 questions." *Ante,* at 23. The majority's statistical "evidence" is irrelevant and misleading.

First, the majority finds that only one juror—Carolyn Wright—was struck on the basis of race, but it neglects to mention that the State asked her only five questions. See App. 71–72, 104–105. Of course, the majority refuses to identify the "certain level of disparity" that meets its "dramatically disparate" standard, *ante,* at 26, but its failure to recognize that the only juror supposedly discriminated against was asked hardly any questions suggests the majority is "slic[ing] and dic[ing]" statistics, *ante,* at 23. Asking other black jurors more questions would be an odd way of "try[ing] to find some pretextual reason" to strike Wright. *Ante,* at 25.

Second, both sides asked a similar number of questions to the jurors they peremptorily struck. This is to be expected—a party will often ask more questions of jurors whose answers raise potential problems. Among other reasons, a party may wish to build a case for a cause strike, and if a cause strike cannot be made, those jurors are more likely to be peremptorily struck. Here, Flowers asked the jurors he struck—all white, Tr. of Oral Arg. 57—an average of about 40 questions, and the State asked the black jurors it struck an average of about 28 questions. The number of questions asked by the State to these jurors is not evidence of race discrimination.

Moreover, the majority forgets that correlation is not causation. The majority appears to assume that the only

relevant difference between the black jurors at issue and seated white jurors is their race. But reality is not so simple. Deciding whether a statistical disparity is caused by a particular factor requires controlling for other potentially relevant variables; otherwise, the difference could be explained by other influences. See Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702, 709 (1980); cf. *Box* v. *Planned Parenthood of Indiana & Kentucky, Inc.*, 587 U. S. ___, ___, n. 4 (2019) (THOMAS, J., concurring) (slip op., at 9, n. 4) (showing that bare statistical disparities can be used to support diametrically different theories of causation). Yet the majority's raw comparison of questions does not control for any of the important differences between struck and seated jurors. See *supra,* at 11–14. This defective analysis does not even begin to provide probative evidence of discrimination. See, *e.g., People Who Care* v. *Rockford Bd. of Ed., School Dist. No. 205*, 111 F. 3d 528, 537–538 (CA7 1997) (Posner, C. J.) ("[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation"). Indeed, it is difficult to conceive of a statistical study that could possibly control for all of the relevant variables in this context, including tone of voice, facial expressions, and other relevant information.

Most fundamentally, the majority's statistics are divorced from the realities of this case. Winona is a very small town, and "'this was the biggest crime that had ever occurred'" there. Tr. 1870. As one juror explained, "'[e]verybody in Winona has probably'" heard about the case. *Id.,* at 1180; accord, *id.,* at 1183 (Flowers' counsel stating the same). One potential juror knew almost everyone "'involved in it'" between her job as a teacher and attendance at church. App. 81–82. Tardy Furniture "'basically did business with the whole Winona community.'" Tr. 2667.

Moreover, Flowers' family was "'very, very prominent'" in Winona's black community. *Id.,* at 1750. As the trial court explained,

> "'Flowers has a number of brothers and sisters. His parents are well-known. [His father] is apparently one of the most well-thought of people in this community. You have had countless numbers of African-American individuals that have come in and said they could not sit in judgment because of their knowledge of Mr. Flowers, and they could not be fair and impartial.'" App. 197; see *id.,* at 199–200; Tr. 1750.

Flowers' counsel stated that when Flowers' father "'was working as a greeter at Wal-Mart,'" there was "'probably not a person in Winona who wouldn't have said, "Mr. Archie's my friend."'" App. 221. According to the trial court, "the overwhelming majority" of potential black jurors "stated that they could not sit in judgment of him because of kinships, friendships, and family ties." *Id.,* at 256.

To obtain a sufficient jury pool, the trial court had to call 600 potential jurors. *Id.,* at 258. In such a small county, that meant a man, his wife, his mother, and his father were all called for jury duty in this case. See Tr. 939–941. According to Flowers,

> "seventy-five percent of the total qualified venire, sixty-three percent of the venire members actually tendered for acceptance or rejection as jurors, and forty percent of the persons empanelled as jurors or alternates (six of 15) were personally acquainted with either the defendant or one or more of the decedents or their families and/or had actual opinions as to guilt or innocence formed prior [to] the trial." Brief for Appellant 130.

Before peremptory strikes even started, the venire had

gone from 42% to 28% black. App. 194–195. As the trial court explained, "'nothing the State has done has caused this statistical abnormality.'" *Id.,* at 198. Instead, any "'statistical abnormality'" "'is strictly because of the prominence of [Flowers'] family.'" *Id.,* at 200. Flowers' counsel admitted that she was not "'surprise[d]'" by the reduction given the circumstances and the experiences in the previous trials. *Id.,* at 199.[7]

The state courts appropriately viewed the parties' questioning in light of these circumstances. The Mississippi Supreme Court, for example, found that the State "asked more questions" of the "jurors who knew more about the case, who had personal relationships with Flowers's family members, who said they could not be impartial, or who said they could not impose the death penalty," and that "[t]hose issues are appropriate for followup questions." 240 So. 3d, at 1125. The court also found that "[t]he State's assertion that elaboration and followup questions were needed with more of the African-American jurors is supported by the record." *Ibid.* The majority wonders why "the State spent far more time questioning the black prospective jurors" and concludes that "[n]o one can know." *Ante*, at 23, 25. But even Flowers admits that "more African-American jurors knew the parties, most of the [State's] follow-up questions pertained to relevant matters, [and] more questions were asked of jurors who had personal relationships about the case, or qualms

———————

[7] One trial had to be moved to a new venue because "during *voir dire* it became apparent that a fair and impartial jury could not be impaneled." *Flowers* v. *State*, 842 So. 2d 531, 535 (Miss. 2003). At another trial, one of two black jurors seated was "excused after he informed the judge that he could not be a fair and impartial juror." *Flowers* v. *State*, 947 So. 2d 910, 916 (Miss. 2007). And at the next trial, one of the alternate jurors, who was black, was convicted of perjury after it came to light that she had lied during *voir dire* about not knowing Flowers and had visited him in jail. *Flowers* v. *State*, 240 So. 3d 1082, 1137 (Miss. 2017).

about the death penalty." Pet. for Cert. 23 (emphasis deleted).

The majority ignores Flowers' concession, but the questions asked by the State bear it out. The State's questions also refute the majority's suggestion that the State did not "not as[k] white prospective jurors th[e] same questions." *Ante,* at 25. The State asked all potential jurors whether Tardy Furniture sued them, and only Wright and Burnside answered in the affirmative. See App. 70–71, 99–100, 217–218. Two of five questions to Wright and around eight questions to Burnside followed up on this lawsuit. *Id.,* at 70–72, 141–143. All potential jurors were asked whether they knew Flowers' father, and no white jurors had worked with him at Wal-Mart. *Id.,* at 61, 218. Two of Wright's remaining three questions followed up on this relationship. *Id.,* at 104–105. The State asked all potential jurors whether anyone lived in the areas around Flowers' house, and no white jurors answered in the affirmative. *Id.,* at 75–81. Seven questions to Copper—another black prospective juror—and three to Burnside followed up on this geographic proximity. *Id.,* at 75–77, 79–80. Copper's remaining questions were mostly about her working with Flowers' father and sister and her statement that she would lean in Flowers' favor. *Id.,* at 77–78, 189–190. Burnside's remaining questions were mostly about Flowers' visits to her house and her statement that she could not judge others. *Id.,* at 80–81, 143–144. The State asked all potential jurors whether anyone was related to Flowers' family, and only Jones, a black prospective juror, answered affirmatively, leading to about 18 follow-up questions. *Id.,* at 72–75, 86–88, 179–180. Jones' remaining questions were mostly about her being late to court and her untruthful answer regarding the death penalty on the jury questionnaire. *Id.,* at 75, 180–182. Finally, nearly all of Cunningham's questions were about her work with Flowers' sister. *Id.,* at 83–85, 130–133. Any reasonable

prosecutor would have followed up on these issues, and the majority does not cite even a single question that it thinks suggests racial discrimination.

The majority's comparison of the State's questions to Copper with its questions to several white jurors is baseless. As an initial matter, Flowers forfeited this argument by not making it at the trial court. See *supra,* at 14–15; App. 235–238. And as the Court has previously explained, "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial" because "an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Snyder*, 552 U. S., at 483.

Even if Flowers had not forfeited this argument, it is meritless. As previously discussed, Copper worked with two of Flowers' family members and testified that she could "'lean toward'" Flowers and would not decide the case "'with an open mind.'" App. 190; see *id.,* at 78. These answers justified heavier questioning than was needed for Chesteen, the white bank teller who occasionally served Flowers' family members. Moreover, the State *did* ask Chesteen and Lester, a white juror who also worked at the bank, "follow-up questions about [their] relationships with Flowers' family." *Ante*, at 24; see App. 83, 86.[8] I have already addressed Lester and Waller, another white juror who had connections to the victims, and why the State did not need to ask them more questions. See *supra*, at 11–14. The majority also references Larry Blaylock and Marcus Fielder, two other white prospective jurors who "had relationships with defense witnesses." *Ante,* at 24.

_____

[8] The majority seems to draw a distinction between individual questions asked during group *voir dire* and individual questions asked during individual *voir dire*. *Ante*, at 23–24. I cannot imagine why this distinction would matter here. The majority does not explain its reasoning, and its statistics treat these questions the same.

As for Blaylock, the majority makes no attempt to say what those "relationships" were, presumably because the only relationship discussed at the *Batson* hearing was Blaylock's 30-year friendship with the *prosecutor's* primary investigator—whom the defense planned to call as a hostile witness. App. 215; Tr. 1041–1042. The investigator was also his uncle by marriage, *id.,* at 1078, and the defense asked Blaylock some 46 questions. *Id.,* at 1041–1042, 1078, 1182–1187. Likewise, Fielder's only relationship discussed at the *Batson* hearing was his work for a prosecution witness who had investigated the murders. See App. 215. The defense felt it necessary to ask Fielder about 30 follow-up questions. Tr. 1255–1260. In short, despite the majority's focus on Copper, *ante*, at 24, no one could (or did) compare the State's need to question her with its need to question these jurors.

Next, the majority complains that the State had a witness testify that Cunningham worked closely with Flowers' sister. According to the majority, "[t]he State apparently did not conduct similar investigations of white prospective jurors." *Ibid.* Putting aside that the majority offers no record support for this claim, the majority does not tell us what investigation was performed, much less which white jurors could or should have been similarly investigated. As far as the record reveals, the State made one call to Cunningham's employer on the morning of the hearing to ask a single question: Where did Cunningham work in relation to Flowers' sister? App. 149, 154. I see no reason to assume that the State failed to conduct any other single-phone-call "investigations" in this high-profile trial. Nor am I aware of white jurors who worked in any proximity to Flowers' family members. If the majority is going to infer racial bias from the State's attempt to present the truth in court—particularly in a case where juror perjury had been a problem, see *supra,* at 21, n. 7—it ought to provide a sound basis for its criticism.

Finally, to support its view that "[t]he difference in the State's approaches to black and white prospective jurors was stark," the majority asserts that "[w]hite prospective jurors who admitted that they or a relative had been convicted of a crime were accepted without apparent further inquiry by the State." *Ante*, at 25. The majority again cites nothing to support this assertion, and the record does not support it. Three of the struck black jurors had relatives with a criminal conviction. See Tr. 883 (Burnside); *id.,* at 885 (Copper); 2d Supp. Record 255b (Cunningham). The State asked no questions to either Copper or Cunningham on this point, and it asked three questions to Burnside about her son's robbery conviction and. See App. 144–145. The State treated white jurors similarly. For example, the State asked three questions to Suzanne Winstead about a nephew's drug charges, Tr. 1190–1191; four questions to Sandra Hamilton about crimes of her first cousins, *id.,* at 977; and two questions to Larry Blaylock about a cousin who committed murder, *id.,* at 978–979.[9]

Because any "disparate questioning or investigation of black and white prospective jurors" here "reflect[s] ordinary race-neutral considerations," *ante,* at 26, this factor provides no evidence of racial discrimination in jury selection below.

E

If this case required us to decide whether the state courts were correct that no *Batson* violation occurred here, I would find the case easy enough. As I have demonstrated,

———————

[9] The majority ominously warns that, through questioning, prosecutors "can try to find some pretextual reason . . . to justify what is in reality a racially motivated strike" and that "[p]rosecutors can decline to seek what they do not want to find about white prospective jurors." *Ante,* at 25. I would not so blithely impute single-minded racism to others. Doing so cheapens actual cases of discrimination.

the evidence overwhelmingly supports the conclusion that
the State did not engage in purposeful race discrimination.
Any competent prosecutor would have struck the jurors
struck below. Indeed, some of the jurors' conflicts might
even have justified for-cause strikes. But this case is
easier yet. The question before us is not whether we
"'would have decided the case differently,'" *Easley* v.
*Cromartie*, 532 U. S. 234, 242 (2001), but instead whether
the state courts were *clearly* wrong. And the answer to
that question is obviously no.

The Court has said many times before that "[t]he trial
court has a pivotal role in evaluating *Batson* claims."
*Snyder*, 552 U. S., at 477. The ultimate question in *Batson* cases—whether the prosecutor engaged in purposeful
discrimination—"involves an evaluation of the prosecutor's
credibility," and "'the best evidence [of discriminatory
intent] often will be the demeanor of the attorney who
exercises the challenge.'" *Ibid.* The question also turns on
"a juror's demeanor," "making the trial court's firsthand
observations of even greater importance." *Ibid.* "[O]nly
the trial judge can be aware of the variations in demeanor
and tone of voice that bear so heavily on the listener's
understanding of and belief in what is said." *Anderson* v.
*Bessemer City*, 470 U. S. 564, 575 (1985).

Because the trial court is best situated to resolve the
sensitive questions at issue in a *Batson* challenge, "a trial
court's ruling on the issue of discriminatory intent must be
sustained unless it is clearly erroneous." *Snyder, supra,* at
477; see *Foster*, 578 U. S., at ___ (slip op., at 10). Our
review is particularly deferential where, as here, "an
intermediate court reviews, and affirms, a trial court's
factual findings." *Easley, supra,* at 242.

Under this clear-error standard of review, "[w]here
there are two permissible views of the evidence, the fact-
finder's choice between them cannot be clearly erroneous."
*Anderson, supra*, at 574; see also *Cooper* v. *Harris*, 581

U. S. \_\_\_, \_\_\_ (2017) (slip op., at 4). The notion that it is "impermissible" to adopt the view of the evidence that I have outlined above is incredible. Besides being supported by carefully reasoned opinions from both the trial court and the Mississippi Supreme Court—opinions that, unlike the majority's, consider all relevant facts and circumstances—that view is *at a minimum* consistent with the factual record. At the *Batson* hearing, the State offered "a coherent and facially plausible story that is not contradicted" by the record, and the trial court's "decision to credit" such a story "can virtually never be clear error." *Anderson*, *supra,* at 575. The trial court reasonably understood the supposedly "dramatically disparate" questioning to be explained by the circumstances of this case— circumstances that the majority does not dispute. Likewise, the trial court reasonably did not view any picayune mistakes by the State to be compelling evidence of racial discrimination. (Of course, neither did the defense, which is presumably why it did not make that argument. But the clear-error and forfeiture doctrines are speed bumps en route to the Court's desired destination.) Yet the Court discovers "clear error" based on its own review of a near-decade-old record. The majority apparently thinks that it is in a better position than the trial court to judge the tone of the questions and answers, the demeanor of the attorneys and jurors, the courtroom dynamic, and the culture of Winona, Mississippi.

## III

Given that there was no evidence of race discrimination in the trial here, the majority's remaining explanation for its decision is conduct that took place *before* this trial. The majority builds its decision around the narrative that this case has a long history of race discrimination. This narrative might make for an entertaining melodrama, but it has no basis in the record. The history, such as it is, does not

come close to carrying Flowers' burden of showing that the state courts clearly erred.

## A

The State exercised 50 peremptory strikes in Flowers' previous trials. As the case comes to us, 49 of those strikes were race neutral. If this history teaches us anything, it is that we should not assume the State strikes jurors based on their race.

Flowers' first trial was for the murder of Bertha Tardy only. In that trial, the State exercised peremptory strikes on five black jurors and seven white jurors. App. 35. The trial court found that Flowers had not made out even a prima facie *Batson* case, *id.,* at 12, n. 3, much less showed purposeful race discrimination in any of the State's strikes. Thus, as this case comes to us, all of the State's strikes in this trial were race neutral.

What the majority calls the second trial is actually Flowers' first trial for another murder—that of Bobo Stewart. During jury selection, the State exercised peremptory strikes on five black jurors and two white jurors; the trial court disallowed one of the State's strikes under *Batson.* App. 35; *id.,* at 17–19. Flowers was convicted and apparently did not appeal on *Batson* grounds. Eventually, the Mississippi Supreme Court reversed Flowers' convictions from the first two trials for reasons unrelated to jury selection. The court held that certain evidence relevant to all four murders was improperly admitted. *Flowers* v. *State*, 773 So. 2d 309, 317, 319–324 (Miss. 2000); *Flowers* v. *State*, 842 So. 2d 531, 538, 539–550 (Miss. 2003).

The State next tried Flowers for all four murders together. In this "third" trial—actually the first trial for the murders of Robert Golden and Carmen Rigby—the State struck 15 black jurors. App. 35. The trial court found no *Batson* violations. *Flowers* v. *State*, 947 So. 2d 910, 916 (Miss. 2007) (plurality opinion). On appeal, Flowers did

not challenge four of the strikes, *id.,* at 918, and the Mississippi Supreme Court unanimously upheld the trial court's ruling as to nine of the other strikes, see *id.,* at 918–935. Four justices, constituting a plurality of the court, would have held that two strikes violated *Batson*, 947 So. 2d, at 926, 928; one justice concurred only in the judgment because she "d[id] not agree" with the "plurality" "that this case is reversible on the *Batson* issue alone," *id.,* at 939 (Cobb, P. J., concurring in result); and four justices would have held that no strikes violated *Batson*, 947 So. 2d, at 942–943 (Smith, C. J., dissenting). If the concurring justice thought any strikes were impermissible, *Batson* would have required her to reverse on that basis.

Thus, the Court is wrong multiple times over to say that the Mississippi Supreme Court "conclud[ed] that the State had again violated *Batson* by discriminating on the basis of race in exercising all 15 of its peremptory strikes against 15 black prospective jurors." *Ante,* at 5. That court unanimously concluded that 13 strikes were race neutral, and a majority concluded that the remaining two strikes did not violate *Batson*. Therefore, neither the trial court nor the Mississippi Supreme Court found any *Batson* violation in this third trial—all 15 strikes were race neutral.[10]

——————

[10] The Court repeatedly and inaccurately attributes statements by the plurality to the Mississippi Supreme Court—or deems those statements part of a "lead opinion," *ante,* at 5, 20, even though a majority of that court disagreed in relevant part. The Court also takes the plurality's statements out of context. For instance, three times the Court quotes the plurality's statement that "'[t]he instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge.'" *Ante,* at 2, 5, 20. But that statement was focused solely on the fact that "[t]he prosecutor exercised all fifteen of his peremptory strikes on African-Americans." *Flowers*, 947 So. 2d, at 935. One could just as easily say that Flowers' own strikes here—11 whites, zero blacks—present an overwhelming prima facie case of racial discrimination. Tr. of Oral Arg. 57 (admitting

In the next two trials, Flowers apparently did not even allege a *Batson* violation. In the "fourth" trial, the State struck 11 black jurors but did not exercise its three remaining strikes; five black jurors were seated. App. 28–29, 35. In the "fifth" trial, the State struck five jurors, but Flowers is unable to identify the race of these jurors, and three black jurors were seated. Brief for Petitioner 13. Thus, up to the present trial, the State had sought to exercise 50 peremptory strikes, 36 on potential black jurors. Finally, in this trial, the State struck five black jurors and one white juror; one black juror sat on the jury, and one black juror was an alternate.

According to the majority, "the State's use of peremptory strikes in Flowers' first four trials reveal[s] a blatant pattern of striking black prospective jurors." *Ante*, at 20. The majority claims that "[o]ver the course of the first four trials, there were 36 black prospective jurors against whom the State could have exercised a peremptory strike," and "[t]he State tried to strike all 36." *Ibid*. The majority's argument is wrong on several levels.

First, the majority is wrong on the numbers. The majority repeatedly says that over "the six trials combined," "the State struck 41 of the 42 black prospective jurors it could have struck." *Ante*, at 31; see *ante,* at 2. Yet in the fourth trial, according to Flowers himself, the State did not exercise available peremptory strikes on at least three black jurors. See App. 28–29. Moreover, the majority does not know the races of the struck jurors in the fifth trial. Given that at least three black jurors were seated and that the State exercised only five strikes, it would appear that the State did not exercise available strikes against at least

_____

that Flowers' trial counsel "only exercised peremptories against white jurors"). As the Court understands, a prima facie case is only the first step of *Batson, ante,* at 12–13, and a majority of the Mississippi Supreme Court in the third trial found that Flowers failed to carry his burden of proving purposeful racial discrimination as to *any* strike.

three black jurors. Finally, in the most recent trial, the State tendered two black jurors for service on the jury, one of whom served as an alternate. (The majority's strike numbers include strikes of alternates, so its juror numbers should too.) However the majority arrived at its numbers, the record tells a different story.[11]

Second, the Court says that "[t]he State's actions in the first four trials necessarily inform our assessment of the State's intent," for "[w]e cannot ignore that history." *Ante,* at 22. Putting aside that no court below ignored the history, the majority completely ignores Flowers' failure to challenge the State's actions in the fifth trial—the one that immediately preceded this one. Flowers bears the burden of proving racial discrimination, and the reason information about the fifth trial is not "available," *ante,* at 21, is that Flowers failed to present it. Perhaps he did not *want* to present it because the State struck only white jurors—who knows? Regardless, this failure must count against Flowers' claim. Surely a party making a *Batson* claim cannot gather data from select trials and present only favorable snippets.

Third, and most importantly, that the State previously sought to exercise 36 strikes against black jurors does not "speak loudly" in favor of discrimination here, *ante,* at 20, because 35 of those 36 strikes were race neutral. By the majority's own telling, the trial court may "consider historical evidence of the State's *discriminatory* peremptory

───────────

[11] Rather than explain its numbers, the Court points out that when pressed at oral argument, the State agreed that 41 of 42 potential black jurors had been stricken. *Ante,* at 2, 20. No one else—not even Flowers—has agreed with that statistic. See Brief for Petitioner 32; App. 35. Flowers certainly did not present it to the state courts. The question before us is whether those courts clearly erred, and in reviewing their decisions, we must affirm "'if the result is correct'" based on the actual record. *NLRB* v. *Kentucky River Community Care, Inc.,* 532 U. S. 706, 722, n. 3 (2001).

strikes from past trials." *Ante,* at 19 (emphasis added). As I have shown, 35 of 36 strikes were not "discriminatory peremptory strikes." The bare number of black-juror strikes is relevant only if one eliminates other explanations for the strikes, cf. *supra,* at 18–19, but prior adjudications (and Flowers' failure to even object to some strikes) establish that legitimate reasons explained all but one of them. Is the majority today holding that the prior courts all committed clear error too? And what about the strikes that even Flowers did not object to—is the majority *sua sponte* holding that the State was engaged in purposeful racial discrimination as to those strikes? The majority's reliance on race-neutral strikes to show discrimination is judicial alchemy.

B

The only incident in the history of this case even hinting at discrimination was that a trial judge 20 years ago prevented the State from striking one black juror in a case involving only one of Flowers' crimes. If this single impermissible strike could provide evidence of purposeful race discrimination in a different trial 11 years later involving different murders (and victims of different races), it is surely the weakest of evidence. Even Flowers concedes that a single "*Batson* violation 20 years ago" would be only "weakly probative." Tr. of Oral Arg. 19–20. That is the precise situation here. And this "weakly probative" single strike certainly does not overcome the complete absence of evidence of purposeful race discrimination in this trial. We know next to nothing about this strike, for Flowers has not even provided us with a transcript of the jury selection from that trial. And the trial court's ruling on the strike was never reviewed on appeal.

Pretending for a moment that the concurring justice in the third trial had voted differently than she did, the history still could not overcome the absence of evidence of

purposeful race discrimination in *this* trial.  Flowers forthrightly acknowledged that he needed to show "discrimination in *this* trial in order to have a *Batson* violation."  *Id.,* at 23 (emphasis added).  At a minimum, the state courts' finding—that the history does not carry Flowers' burden of proving purposeful race discrimination here—is not clearly erroneous.  The courts below were presented with Flowers' view of the history, and even accepting that view and "[t]aking into account the 'historical evidence' of past discrimination," the Mississippi Supreme Court held that the trial court did not err "in finding that the State did not violate *Batson*."  240 So. 2d, at 1135; see *id.,* at 1122–1124.  The majority simply disregards this assessment by the state courts.

## IV

Much of the Court's opinion is a paean to *Batson* v. *Kentucky*, which requires that a duly convicted criminal go free because a juror was arguably deprived of his right to serve on the jury.  That rule was suspect when it was announced, and I am even less confident of it today.  *Batson* has led the Court to disregard Article III's limitations on standing by giving a windfall to a convicted criminal who, even under *Batson*'s logic, suffered no injury.  It has forced equal protection principles onto a procedure designed to give parties absolute discretion in making individual strikes.  And it has blinded the Court to the reality that racial prejudice exists and can affect the fairness of trials.

## A

In *Batson*, this Court held that the Equal Protection Clause prohibits the State from "challeng[ing] potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case."  476 U. S., at 89.  "[I]ndividual

jurors subjected to racial exclusion have the legal right to bring suit on their own behalf." *Powers* v. *Ohio*, 499 U. S. 400, 414 (1991). To establish standing to assert this equal protection claim in a separate lawsuit, the juror would need to show that the State's action caused him to suffer an injury in fact, and a likelihood that a favorable decision will redress the injury. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992). Flowers, however, was not the excluded juror. And although he is a party to an ongoing proceeding, "'"standing is not dispensed in gross"'"; to the contrary, "'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Town of Chester* v. *Laroe Estates, Inc.*, 581 U. S. ___, ___ (2017) (slip op., at 5).

Flowers should not have standing to assert the excluded juror's claim. He does not dispute that the jury that convicted him was impartial, see U. S. Const., Amdt. VI, and as the Court has said many times, "'[d]efendants are not entitled to a jury of any particular composition.'" *Holland* v. *Illinois*, 493 U. S. 474, 483 (1990). He therefore suffered no legally cognizable injury. The only other plausible reason a defendant could suffer an injury from a *Batson* violation is if the Court thinks that he has a better chance of winning if more members of his race are on the jury. But that thinking relies on the very assumption that *Batson* rejects: that jurors might "'be partial to the defendant because of their shared race.'" *Ante,* at 14 (quoting *Batson*, *supra,* at 97). Moreover, it cannot be squared with the Court's later decisions, which hold that "race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges." *Powers*, 499 U. S., at 416 (holding that a white defendant has standing to challenge strikes of black jurors).

Today, the Court holds that Carolyn Wright was denied equal protection by being excluded from jury service. But she is not the person challenging Flowers' convictions (she

would lack standing to do so), and I do not understand how Flowers can have standing to assert her claim. Why should a "denial of equal protection to other people" that does "not affect the fairness of that trial" mean that "the defendant must go free"? *Id.*, at 431 (Scalia, J., dissenting).

In *Powers*, the Court relied on the doctrine of third-party standing. As an initial matter, I doubt "whether a party who has no personal constitutional right at stake in a case should ever be allowed to litigate the constitutional rights of others." *Kowalski* v. *Tesmer*, 543 U. S. 125, 135 (2004) (THOMAS, J., concurring); see also *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. \_\_\_, \_\_\_–\_\_\_ (2016) (THOMAS, J., dissenting) (slip op., at 2–5).

Even accepting the notion of third-party standing, it is hard to see how it could be satisfied in *Batson* cases. The Court's precedents require that a litigant asserting another's rights have suffered an "'injury in fact'" and have "a close relation" to the third party. *Powers*, *supra*, at 411. As shown, Flowers suffered no injury in fact under the Court's precedents. Moreover, in the ordinary case, the defendant has no relation whatsoever to the struck jurors. (Here, as it happens, all the struck jurors knew Flowers or his family, but that hardly *helps* his *Batson* claim.)

In *Powers*, the Court concluded that defendants and struck jurors share a "common interest." 499 U. S., at 413. But like most defendants, Flowers' interest is in avoiding prison (or execution). A struck juror, by contrast, is unlikely to feel better about being excluded from jury service simply because a convicted criminal may go free. And some potential jurors, like Flancie Jones here, "'really and truly . . . don't want to'" serve on a jury in the first place. App. 181 (emphasis added); see also *Hayes* v. *Missouri*, 120 U. S. 68, 71 (1887) (referring to "an unfortunate disposition on the part of business men to escape from jury duty"). If Flowers had succeeded on his *Batson* claim at

trial and forced Jones onto the jury, it seems that *he*—her supposed third-party representative with a "common interest"—would have inflicted an injury on her.

Our remedy for *Batson* violations proves the point. The convicted criminal, who suffered no injury, gets his conviction vacated.[12]   And even if the struck juror suffered a cognizable injury, but see *Powers, supra,* at 423–426 (Scalia, J., dissenting), that injury certainly is not redressed by undoing the valid conviction of another.  Under Article III, Flowers should not have standing.

## B

The more fundamental problem is *Batson* itself.  The "entire line of cases following *Batson*" is "a misguided effort to remedy a general societal wrong by using the Constitution to regulate the traditionally discretionary exercise of peremptory challenges." *Campbell* v. *Louisiana*, 523 U. S. 392, 404, n. 1 (1998) (THOMAS, J., concurring in part and dissenting in part).  "[R]ather than helping to ensure the fairness of criminal trials," *Batson* "serves only to undercut that fairness by emphasizing the rights of excluded jurors at the expense of the traditional protections accorded criminal defendants of all races." *Campbell, supra,* at 404, n. 1.  I would return to our pre-*Batson* understanding—that race matters in the courtroom—and thereby return to litigants one of the most important tools to combat prejudice in their cases.

### 1

In *Strauder* v. *West Virginia*, 100 U. S. 303 (1880), the

_____

[12] The Court has never explained "why a violation of a third party's right to serve on a jury should be grounds for reversal when other violations of third-party rights, such as obtaining evidence against the defendant in violation of another person's Fourth or Fifth Amendment rights, are not." *Campbell* v. *Louisiana*, 523 U. S. 392, 405 (1998) (THOMAS, J., concurring in part and dissenting in part).

Court invalidated a state law that prohibited blacks from serving on juries. In doing so, we recognized that the racial composition of a jury could affect the outcome of a criminal case. See *id.,* at 308–309. The Court explained that "[i]t is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy." *Id.*, at 309. Thus, we understood that allowing the defendant an opportunity to "secur[e] representation of the defendant's race on the jury may help to overcome racial bias and provide the defendant with a better chance of having a fair trial." *Georgia* v. *McCollum*, 505 U. S. 42, 61 (1992) (THOMAS, J., concurring in judgment).

In *Swain* v. *Alabama*, 380 U. S. 202 (1965), the Court held that individual peremptory strikes could not give rise to an equal protection challenge. *Swain* followed *Strauder* in assuming that race—like other factors that are generally unsuitable for the government to use in making classifications—can be considered in peremptory strikes: "In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause." *Swain*, 380 U. S., at 221. That is because the peremptory "challenge is 'one of the most important of the rights secured to the accused.'" *Id.*, at 219. Based on its long history, the peremptory system "affords a suitable and necessary method of securing juries which in fact and in the opinion of the parties are fair and impartial." *Id.,* at 212; see *id.,* at 212–219. The strike both "eliminate[s] extremes of partiality on both sides" and "assure[s] the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." *Id.,* at 219. Because this system, "in and of itself, provides justification for striking any group of otherwise qualified jurors in any

given case, whether they be Negroes, Catholics, account-
ants or those with blue eyes," *id.,* at 212, we concluded
that an equal protection challenge was unavailable
against individual peremptory strikes.

Then, in a departure from the previous century of juris-
prudence, the Court moved its focus from the protections
accorded the *defendant* to the perceptions of a hypothetical
struck *juror*. In *Batson*, the Court concluded that the
government could not exercise individual strikes based
solely on "the assumption—or [the] intuitive judgment—
that [jurors] would be partial to the defendant because of
their shared race." 476 U. S., at 97. The Court's opinion
in *Batson* equated a law categorically excluding a class of
people from jury service with the use of discretionary
peremptory strikes to remove members of that class: "Just
as the Equal Protection Clause forbids the States to ex-
clude black persons from the venire on the assumption
that blacks as a group are unqualified to serve as jurors,
so it forbids the States to strike black veniremen on the
assumption that they will be biased in a particular case
simply because the defendant is black." *Ibid.* (citation
omitted). *Batson* repeatedly relies on this analogy. See
*id.,* at 86, 89; *id.,* at 87 ("A person's race simply is unrelated
to his fitness as a juror" (internal quotation marks omit-
ted)); see also *ante,* at 14 (quoting *Batson*, *supra,* at 104–
105 (Marshall, J., concurring)); *Powers*, 499 U. S., at 410
("Race cannot be a proxy for determining juror bias or
competence").

But this framing of the issue ignores the nature and
basis of the peremptory strike and the realities of racial
prejudice. A peremptory strike reflects no judgment on a
juror's competence, ability, or fitness. Instead, the strike
is exercised based on intuitions that a potential juror may
be less sympathetic to a party's case. As Chief Justice
Burger emphasized, "venire-pool exclusion bespeaks *a
priori* across-the-board total unfitness, while peremptory-

strike exclusion merely suggests potential partiality in a particular isolated case." *Batson*, *supra*, at 122–123 (dissenting opinion) (internal quotation marks omitted); accord, *Powers*, *supra,* at 424 (Scalia, J., dissenting). "[T]he question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is *in fact* partial, but whether one from a different group is *less likely* to be." *Swain*, 380 U. S., at 220–221 (emphasis added). Therefore, "veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges"; instead, "they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried." *Id.*, at 221.

*Batson* rejects the premise that peremptory strikes can be exercised on the basis of generalizations and demands instead "an assessment of individual qualifications." 476 U. S., at 87. The Court's *Batson* jurisprudence seems to conceive of jury selection more as a project for affirming "the dignity of persons" than as a process for providing a jury that is, including in the parties' view, fairer. *Powers*, *supra*, at 402; see *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 631 (1991); see also *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 140–142 (1994).

2

*Batson*'s focus on individual jurors' rights is wholly contrary to the rationale underlying peremptory challenges. And the application of equal protection analysis to individual strikes has produced distortions in our jurisprudence that are symptomatic of its poor fit, both as a matter of common sense and the protections traditionally accorded litigants.

The Court did not apply equal protection principles to individual peremptory strikes until more than 100 years after the Fourteenth Amendment was ratified. Once it

did, it quickly extended *Batson* to civil actions, strikes by criminal defendants, and strikes based on sex. *Edmonson*, *supra*; *McCollum*, 505 U. S. 42; *J. E. B.*, *supra*. But even now, we do not apply generally applicable equal protection principles to peremptory strikes. For example, our precedents do not apply "strict scrutiny" to race-based peremptory strikes. And we apply "the same protection against sex discrimination as race discrimination" in reviewing peremptory strikes, *J. E. B.*, *supra*, at 145, even though sex is subject to "heightened" rather than "strict" scrutiny under our precedents. Finally, we have not subjected all peremptory strikes to "rational basis" review, which normally applies absent a protected characteristic. *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 440–442 (1985); see generally *Batson*, *supra*, at 123–125 (Burger, J., dissenting); *J. E. B.*, *supra*, at 161 (Scalia, J., dissenting). Thus, the Court's own jurisprudence seems to recognize that its equal protection principles do not naturally apply to individual, discretionary strikes.

Now that we have followed *Batson* to its logical conclusion and applied it to race- and sex-based strikes without regard to the race or sex of the defendant, it is impossible to exercise a peremptory strike that cannot be challenged by the opposing party, thereby requiring a "neutral" explanation for the strike. But requiring an explanation is inconsistent with the very nature of peremptory strikes. Peremptory strikes are designed to protect against fears of partiality by giving effect to the parties' intuitions about jurors' often-unstated biases. "[E]xercised on grounds normally thought irrelevant to legal proceedings or official action," like "race, religion, nationality, occupation or affiliations," *Swain*, *supra*, at 220, they are a form of action that is by nature "arbitrary and capricious," 4 W. Blackstone, Commentaries on the Laws of England 346 (1769) The strike must "be exercised with full freedom, or it fails of its full purpose." *Lewis* v. *United States*, 146

U. S. 370, 378 (1892). Because the strike may be exercised on as little as the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another," *id.,* at 376, reasoned explanation is often impossible. And where scrutiny of individual strikes is permitted, the strike is "no longer . . . peremptory, each and every challenge being open to examination." *Swain*, *supra*, at 222.

In sum, as other Members of this Court have recognized, *Batson* charted the course for eliminating peremptory strikes. See, *e.g., Rice* v. *Collins*, 546 U. S. 333, 344 (2006) (BREYER, J., concurring); *Batson*, *supra,* at 107–108 (Marshall, J., concurring). Although those Justices welcomed the prospect, I do not. The peremptory system "has always been held essential to the fairness of trial by jury." *Lewis*, *supra,* at 376. And the basic premise of *Strauder*— that a juror's racial prejudices can make a trial less fair— has not become "obsolete." *McCollum*, 505 U. S., at 61 (opinion of THOMAS, J.). The racial composition of a jury matters because racial biases, sympathies, and prejudices still exist. This is not a matter of "assumptions," as *Batson* said. It is a matter of reality.[13] The Court knows these prejudices exist. Why else would it say that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias"? *Turner* v. *Murray*, 476 U. S. 28, 36–37 (1986).[14] For that matter,

———————

[13] Academic studies appear to support this commonsense proposition. See, *e.g.,* Carter & Mazzula, Race and Racial Identity Status Attitudes, 11 J. Ethnicity Crim. Justice 196, 211 (2013) ("[R]acial bias exists in juror decision making"); Ellsworth & Sommers, Race in the Courtroom, 26 Personality & Soc. Psychol. Bull. 1367, 1367–1379 (2000). Cf. *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 148–149 (1994) (O'Connor, J., concurring) ("We know that like race, gender matters").

[14] It is telling that Flowers here sought a new trial because the trial court supposedly failed to allow sufficient questioning on racial prejudice. See Record 2936. Evidently Flowers was operating "on the

why else say here that "Flowers is black" and the "prosecutor is white"? *Ante,* at 3. Yet the Court continues to apply a line of cases that prevents, among other things, black defendants from striking potentially hostile white jurors. I remain "certain that black criminal defendants will rue the day that this Court ventured down this road that inexorably will lead to the elimination of peremptory strikes." *McCollum, supra,* at 60 (opinion of THOMAS, J.).

Instead of focusing on the possibility that a juror will misperceive a peremptory strike as threatening his dignity, I would return the Court's focus to the fairness of trials for the defendant whose liberty is at stake and to the People who seek justice under the law.

\*  \*  \*

If the Court's opinion today has a redeeming quality, it is this: The State is perfectly free to convict Curtis Flowers again. Otherwise, the opinion distorts our legal standards, ignores the record, and reflects utter disrespect for the careful analysis of the Mississippi courts. Any competent prosecutor would have exercised the same strikes as the State did in this trial. And although the Court's opinion might boost its self-esteem, it also needlessly prolongs the suffering of four victims' families. I respectfully dissent.

---

assumption that" jurors might "be biased in a particular case simply because the defendant is black." *Batson* v. *Kentucky*, 476 U. S. 79, 97 (1986). Perhaps unsurprisingly, then, he exercised peremptory strikes against 11 white jurors and 0 black jurors.